## INDIANAPOLIS GLOVE CO. v. UNITED STATES.
### No. 6421.

Circuit Court of Appeals, Seventh Circuit.

April 4, 1938.

James W. Morris, Asst. Atty. Gen., Sewall Key and Leon Cooper, Sp. Assts. to Atty. Gen., and Val Nolan, U. S. Atty., and B. Howard Caughran, Asst. U. S. Atty., both of Indianapolis, Ind., for the United States.

Louise Foster, Sp. Asst. Atty. Gen., for the United States.

Paul Y. Davis, Kurt F. Pantzer, Ernest R. Baltzell, and William G. Sparks, all of Indianapolis, Ind., for appellee.

Before EVANS and MAJOR, Circuit Judges and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment of the District Court in an action to recover income taxes in the amount of $10,681.44, with interest thereon, alleged to have been overpaid by appellee for the calendar year 1929; a claim for refund having been disallowed by the Commissioner of Internal Revenue. The applicable statute and regulation is section 23(a) of the Revenue Act of 1928, 45 Stat. 799, 26 U.S.C.A. § 23 and note, and Article 128 of Regulations 74:

Section 23(a):

"In computing net income there shall be allowed as deductions:

"(a) Expenses. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered."

Article 128: "Bonuses to employees.— Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or are in excess of reasonable compensation for services, are not deductible from gross income."

The facts were largely stipulated and are substantially as follows: Appellee is and was an Indiana corporation engaged in the business of manufacturing and selling gloves and similar products. In June, 1925, at a special meeting of stockholders, it was authorized to offer 850 shares of its common stock, having a total par value of $85,000, to 15 designated employees at par, and to accept therefor their respective noninterest-bearing demand notes aggregating $85,000; the said shares of stock to be held as collateral security for the payment of the notes. Stock dividends were to be applied upon the payment of the notes and it was agreed that the notes should be canceled and surrendered to the makers when the stock dividends equaled the face value of such notes. The stock was issued in the names of the employees as authorized, and the latter delivered to appellee their demand promissory notes in respective amounts exactly equal to the par value of the shares issued to each. The notes so received were carried on appellee's books of accounts in the notes receivable account as an asset, and the shares of stock issued as aforesaid were entered and carried in appellee's books of account in the capital stock account. The certificates representing the 850 shares of stock so issued were retained by appellee as collateral security for the payment of said notes. The market value of the stock when issued was $159.50 per share.

During the years 1925 to 1929, inclusive, appellee earned $108.48 net for each share of its common stock outstanding during those years, after the payment of dividends on its preferred stock. During this period, cash dividends amounting to $37 per share were paid by appellee on its outstanding stock, including that issued in the names of the employees referred to, and this amounted to $31,450 paid to such employees. None of these cash dividends were applied on the said promissory notes; in fact, no payment whatever was made upon such notes by the makers thereof.

On August 22, 1929, the common stock of appellee had a book value of approximately $200 per share, and on that date, appellee, by appropriate action, changed the character of its common stock from $100 par value shares to no par value shares and authorized the issuance of 4 shares of the latter for each share of the former. Thus, the 850 shares of par value stock issued to the 15 individual employees were converted into 3,400 shares of no par value stock; the latter having a market value of $57.12.

By action of appellee's board of directors, August 24, 1929, new notes of the employees were substituted, aggregating $85,000, which were interest bearing, and the cash, as well as stock dividends, were to be applied on the payment of such notes. The old notes were returned to the makers and at the same time half of the 3,400 shares of common stock was delivered to such employees, and the stock thus delivered affords the basis for the present controversy.

The remaining one-half of said stock, or 1,700 shares, was retained and continued to be held as collateral for the substituted notes. The certificates delivered to the

employees in August, 1929, were not reported as additional compensation· to those individuals in the income tax return filed by appellee for that year, nor were they entered upon appellee's books or records as compensation paid or owing to said employees.

On March 8, 1932, appellee, by appropriate action, relieved the makers of the substituted notes of all liability to the company, ordered the notes surrendered, and repurchased the· 1,700 shares of stock held as collateral.

January 6, 1932, appellee filed a claim for a refund of 1929 income taxes in the sum of $10,681.44, based upon the contention that the fair market value of the 1,700 shares of no par value stock, the certificates for which were delivered to the employees on August 24, 1929, represents additional compensation for services rendered by such individuals. Appellant has set forth in considerable detail the salaries and compensation received by each of such employees for each of the years from 1925 to 1929, inclusive, with a view of showing that even though the 1,700 shares of stock thus delivered in 1929 be considered as additional compensation, it was not reasonable as such within the terms of the pertinent statute and regulation. In view of the conclusion reached, we do not regard it as important in this opinion to set forth such figures.

The essential questions in controversy: First, are the 1,700 shares of common stock of appellee issued to its employees in 1925 and retained by it as collateral security for the notes executed by the employees in favor of appellee to be treated as additional compensation for services rendered, or were they sold to such employees; second, if such shares of stock be treated as additional compensation, is it such for the year 1925, when issued, or 1929, when delivered; and, third, if treated as additional compensation to employees, is the amount reasonable when added to other compensation paid to such employees?

■ The court below made special findings of fact which are binding upon this court if there be substantial evidence fairly tending to establish the facts as found. United States v. Jefferson Electric Co., 291 U.S. 386, 407, 54 S.Ct. 443, 450, 78 L. Ed. 859; Law v. United States, 266 U.S. 494, 496, 45 S.Ct. 175, 176, 69 L.Ed. 401. Pertinent extracts from such findings are found in the footnote.[1]

■ The court permitted certain officers of appellee, over the objection of appellant, to testify as to certain matters pertaining to the agreement between appellee and its employees at the time of the related transaction of June 23, 1925. It is claimed the effect of this testimony was to

[1] "At a special meeting of the stockholders of the plaintiff corporation held on June 23, 1925, as recorded in the minutes of the said meeting, the following occurred:

"Messrs. Zwick and Elsey each made short talks expressing their appreciation for the loyalty manifested by the employees, advising that arrangements had been made to distribute eighty-five thousand dollars of common stock to some of the men holding more responsible positions, taking their notes therefor and holding the company script as collateral until such time as additional stock dividends can be paid from surplus. The company then proposes to surrender the notes to employees instead of giving them the equivalent amount of additional stock. By this method the notes are to be eventually paid. * * *

"The fifteen employees above mentioned were present at the meeting of plaintiff's stockholders held June 23d, 1925. The terms of the stockholders' resolution adopted at such meeting were explained to them, and that their ultimate receipt of the stock which they were to receive pursuant to such resolution depended upon the making, during the period, of sufficient earnings to justify the payment of a 100% stock dividend. It was also stated to them that they would not be required to make payment of the notes in any other manner. * * *

"Plaintiff's purpose in entering into the transaction shown in the last finding was to pay to the employees named additional compensation for their services in such manner that its ultimate payment would depend upon the success of the Company and of the efforts of these employees in promoting the company's business. * * *

"The 1700 shares of stock distributed in 1929 to the fifteen employees named in the resolution of June 23d, 1925, constituted reasonable additional compensation for services actually rendered to plaintiff by the employees receiving the same during the years 1925 to 1929, inclusive, and the value of such 1700 shares of stock, namely $97,104, was an expense paid by plaintiff in the year 1929 in the carrying on of plaintiff's business."

vary the terms of the written instruments executed by the parties at that time. An investigation of the record convinces us that some of the findings as made by the court find support only by giving weight to this parol testimony. Undoubtedly, the general rule is that parties to a written contract are precluded from showing, by parol evidence, that the contract was something different from that contained in the instrument itself. From an investigation of the authorities, however, we conclude such rule cannot be invoked by a third person not a party to the written instrument for whose benefit and protection the rule has been established. In White v. Woods, 183 Ind. 500, 109 N.E. 761, is an exhaustive analysis of the rule and authorities. The court on page 504 of 183 Ind., 109 N.E. 761, 763, said: "It is unquestionably true that the rule does not operate to exclude parol evidence, otherwise admissible, in a controversy between strangers, or one of the parties and strangers, who are not representatives or privies of a party, and have no connection with the instrument, where they (the strangers) are not seeking to enforce it as effective for their own benefit, or the like."

Thus, the parol evidence rule sought to be invoked by appellant not being applicable, the court properly admitted the oral testimony, and, when such is considered, we find substantial evidence to support the findings of the court with reference to the agreement between appellee and its employees in 1925.

We also find substantial evidence to support the court's finding that the additional compensation, if such it be, represented by the 1,700 shares of stock delivered to the employees in 1929, was reasonable to the extent and in the amount as found by the court.

Accepting the trial court's findings of fact as we must, we are called upon to determine whether the law has been properly applied. Such determination revolves largely around the question as to whether the transaction between appellee and its employees in 1925 constituted an absolute sale of the stock or whether it was merely an arrangement between the parties by which the employees were to receive an additional compensation for services rendered by them in succeeding years when and if certain things occurred. The solution of this question is not an easy one and a plausible argument may be made upon both sides. Appellant contends that the transaction was consummated and completed when the shares of stock were issued and the notes accepted, and that it contains all the elements of a sale. It treats the notes the same as a money consideration and insists the transaction is no different from what it would have been had appellee delivered the stock to the employees simultaneously with the delivery of the notes. The fact, of course, that the certificates were issued in the name of the employees and notes accepted for the agreed value of the stock tends to support this theory. Such position, however, is weakened, if not refuted, by the findings of fact as made by the District Court. We think, in solving the question, weight must be given, not only to such findings, but to the circumstances surrounding the transaction, as well as the conduct and acts of the parties bearing upon their intentions as to what was the true agreement. In other words, what did the parties have in their minds at that time? Notwithstanding that the employees gave their demand notes, valid upon their face, yet they were told that such notes would not be collected and that they were to be paid entirely from stock dividends when such dividends were sufficient for such purpose. The fact that the notes were noninterest bearing is consistent with this theory and the further undisputed fact that for five years appellee made no effort to, and judged by its actions, never had any intention of collecting said notes in whole or in part, together with the fact that the employees made no payment, is to us a strong circumstance that said notes were given in accordance with an agreement that they were not to be paid.

It is of some consequence, we think, that the 1,700 shares of stock, delivered to the employees in 1929, were paid for solely by appellee and without any cost to the employees. In other words, unless it be the services rendered by the employees, the stock received by them in 1929 was without consideration on their part. While the subsequent acts and conduct of the parties are not determinative of the agreement made in 1925, yet it seems to us such acts and conduct must be considered in ascertaining the real contract entered into between appellee and its employees.

It is said that appellee could have, at any time, brought suit and recovered on said notes. To have so done would have been in violation of its promise, and the

fact that it retained such notes in its possession for five years without doing so is a rather strong circumstance in support of the findings of the District Court that there was an agreement to the contrary.

In derogation of the contention that the arrangement between appellee and its employees was for the purpose of providing additional compensation, it is said there was no provision which bound the latter to continue in the service of appellee. The fact is, however, that the employees did remain in appellee's employment, and even though there was no express provision, what other conclusion can be reached than that it was implied that they should do so? What could have been the purpose of appellee in issuing the shares of stock to these employees, taking their notes without interest, coupled with an agreement that the makers of the notes would never be called upon for payment, if it did not contemplate the continued services of such employees? We are unable to find any satisfactory answer to such query, except such arrangement was made as an inducement to the employees to give their best services so that the business might prosper, in which prosperity the employee was to share in the form of additional compensation.

The hopes entertained by the parties in 1925 were realized to such an extent that in 1929 the shares of stock had substantially doubled in value. In the reorganization of that year, the 850 shares of stock were canceled and 3,400 shares issued in their place. Half of this stock was sufficient to secure the substituted notes, the other 1,700 shares were merely a reflection of the prosperity enjoyed by appellee since 1925, which, in conformity with the understanding of the parties, the employees were permitted to share by receiving the shares of stock in question. It seems apparent it must have been as an additional compensation which appellee was entitled to treat as a deduction for the year 1929. We are unable to adopt appellant's theory that, if appellee is entitled to a deduction for additional compensation, it was for the year 1925, rather than 1929. At that time the employees received nothing except to become participants in an arrangement by which they might benefit in the future. Nor is it essential that the services be rendered during the year for which the deduction is claimed.

As was said in Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 116, 119, 50 S. Ct. 273, 274, 74 L.Ed. 733: "The statute does not require that the services should be actually rendered during the taxable year, but that the payments therefor shall be proper expenses paid or incurred during the taxable year."

Appellant relies strongly upon the opinion of this court in Gardner-Denver Company v. Commissioner, 7 Cir., 75 F.2d 38. In many respects, the situation there presented is similar to the one here. We find, however, this clear distinction, in that, there the employees gave notes in an amount equal to the market value of the stock which were payable at all events with interest from date. There was a written agreement that the employees were to pay so much per month until the indebtedness represented by the notes was extinguished. The opinion of the Board of Tax Appeals in that case, 27 B.T.A. 1171, goes into the facts more fully than does this court, and it is there plainly shown that the full amount of the notes given was to be paid by the employees either by deducting certain amounts from their wages, or otherwise. That was an essential, if not controlling, element, from which the court concluded the involved agreement constituted a sale of the stock. We do not regard that case as controlling here, where the makers of the notes paid nothing and, in fact, were relieved of all obligation to pay.

Both sides rely upon Alger-Sullivan Lumber Company v. Commissioner of Internal Revenue, 5 Cir., 57 F.2d 3. In that case the taxpayer entered into an agreement with its employees whereby its stock was to be held in its treasury for the employees at $100 per share. The same was to be paid for out of dividends arising from the stock until the purchase price was discharged, when the employees would be entitled to receive the stock. In 1921, the dividends were sufficient to pay the purchase price of the stock, when it was issued to the employees. In discussing the question involved, the court on page 5 of 57 F.2d said: "It is clear that the contracts in question lacked essential elements of a sale. There was no agreement to buy. There was no price in money to be paid by the employee, and he gave nothing for the stock except his honest and faithful services, which he was obliged to continue until the divi-

dends credited equalled the par value of the stock. If there had been no dividends, he might never have become the owner of the stock set aside to him. The other provisions of the contract are immaterial, as conditions did not arise to bring them into operation. It is evident that petitioner intended in good faith to give bonuses in stock to valued employees as additional compensation, and there was no intention to make an outright sale of stock to them."

This language, as will be noted, is very pertinent to the instant situation. The same court in Moore v. McGrawl, 5 Cir., 63 F.2d 593, again had occasion to consider a similar question. In the latter case the employee gave his note payable on demand, but the note provided that while there was expressed an unconditional obligation to pay, nevertheless, the real agreement was that the note should be paid only out of dividends accruing upon the stock. The latter was issued in the name of the employee, indorsed by him, and redelivered to the company. It will be noted that this situation is strikingly similar to that here presented. On page 594 of 63 F.2d it is said: "In a case involving a similar contract, we held that, as there was no obligation on the part of the employee to pay for the stock, the agreement was lacking in mutuality, and consequently that there was no sale or transfer of title to the stock. Alger-Sullivan Lumber Co. v. Commissioner of Internal Revenue (C.C.A.) 57 F.2d 3. There is nothing to differentiate this from that case, and we see no reason to change our opinion."

Appellee stresses the case of Hudson Motor Car Company v. United States, 3 F.Supp. 834, 843, an opinion by the United States Court of Claims, while appellant insists the facts in that case are at such variance with those here that it cannot be regarded as an authority. However that may be, the language of the court strikes us as being appropriate. On page 846 of 3 F.Supp. it is said: "When we come to consider the entire contract and what transpired with respect thereto, the conclusion seems inescapable that whatever Hills received in the form of the stock was compensation for services rendered. Any other conclusion would be tantamount to saying that plaintiff gave the stock to him, since it is clear that no payments were made for the stock other than the rendering of service. It is, of course, true that dividends were allowed to accumulate on the stock until such accumulation equaled what, in one sense, might be termed the purchase price, and from this defendant seems to contend in effect that Hills was constructively receiving dividends, which were being applied in satisfaction of the purchase price, but how did Hills acquire the right to receive the dividends which might be so applied? It would seem a most unusual situation for an individual to be able to acquire stock under a contract by which the stock would be paid for from the dividends without any other obligation resting on the individual to make payment. Any one would be willing to make acquisitions under such circumstances, since there would be everything to gain and nothing to lose. On the other hand, it is difficult to suppose a case where the owner of valuable dividend-paying stock would be willing to 'sell' it under such term with no other consideration."

Many other cases are cited as sustaining the positions of the respective parties, an analysis of which would unduly prolong this opinion. Naturally, the results reached by the courts in such cases must depend to a considerable extent upon the particular situation presented. A study of the cases convinces us that courts generally have undertaken to give effect to the real intention of the parties to such agreements. The substance of the arrangement, rather than the form, is the matter for ascertainment.

We are of the opinion that there was no intention on the part of either appellee or its employees that the transaction of June, 1925, should constitute a sale of the shares of stock. On the contrary, we think it was their intention and understanding to provide a plan by which the employees were to receive additional compensation for services rendered. The acts and conduct of the parties at the time the agreement was entered into, as well as subsequently, are consistent with the latter theory—inconsistent with the former. Thus concluding, we find no reversible error in the judgment of the court below. The same is affirmed.

EVANS, Circuit Judge (dissenting).

For two reasons I find myself unable to accept the conclusion of the majority of the court.

(1) Plaintiff failed to bring its claim for deduction within section 23(a), Reve-

822

nue Act 1928, 26 U.S.C.A. § 23 and note, or article 128 of Regulations 74.

(2) If the payment of a bonus is established it was deductible in 1925 and not in 1929, as claimed.

(1) In reaching conclusion No. 1, I assume (a) that the burden is upon the taxpayer to prove facts upon which the deduction depends and (b) all the essential facts were stipulated and were covered by the court's thorough and specific findings. These covered the detailed transactions which are briefly set forth in the statement appearing in the majority opinion. They raise a question of law.

The precise question may be stated thus: Do the facts as stated show the payment of a reasonable allowance for salaries or other compensation for personal services actually rendered by the fifteen employees of plaintiff? In answering this question it must be, and is, assumed that "bonuses" are deductible when they are reasonable and are paid in good faith and as additional compensation for services actually rendered by the employees.

The execution of notes by the fifteen employees and the pledging of the stock which the notes purchased, to secure the payment of their notes, conclusively negatives the existence of a gift of such stock as a bonus to said employees. The transaction was doubtless motivated by a worthy desire, namely, to distribute stock among faithful employees. This motive was not, however, determinative of the grant of a bonus, the essential feature of which is a gift or reward for services rendered. The instant transaction was like unto one where the owner of a farm conveys it to another and takes back a note and mortgage. Here the employees gave their notes for the stock which was issued to them and then assigned the stock as collateral to secure their notes. The rate of interest or the absence of any interest provision in the notes has no bearing on the nature of the transaction. Positive, unequivocal written documents evidencing an absolute liability such as those before us speak for themselves and establish a status which cannot and should not be set aside in order that one of the contracting parties may thereafter avoid or lessen its Federal income tax.

(2) Equally persuasive is the second reason. If bonuses were found to have been given, they were given in 1925 and not in 1929.

The transaction which is the basis of the asserted payment of a bonus or additional compensation occurred in 1925. There was a modification of the 1925 agreement in 1929 but the modification did not affect the facts which alone determined the existence or non-existence of a bonus grant in 1925. Solid substantiation of the conclusion that the stock was sold in 1925 appears in the fact that the employees thereafter received the dividends on said stock. In truth, the modification of the agreement in 1929 which accompanied the stock dividend of that year called for new notes which drew interest to replace the old notes which did not draw interest.

If we appraise the transactions as plaintiff contends, we have the execution of notes by employees but with the verbal understanding that they were not enforceable and were void as between the parties. In 1929, however, the employees gave new notes which were enforceable and drew interest. Such a modification was not a gift,—a bonus to the employees. The 1929 transaction was favorable to the employer and it could make no valid deduction for it in its income tax return.

If plaintiff's position be upheld, then a taxpayer may choose the year when he will claim his bonus deductions. That is to say, a solemn, unequivocal written agreement made by employer and employee for the sale of stock, the delivery of notes therefor, and the pledging of the stock to secure the purchase money notes, may, notwithstanding the employer pays and the employee receives cash dividends for several years, be nullified by an oral agreement of the parties to the effect that the written documents were unenforceable and void, but may become binding and valid if and when the company has an abnormal income and a correspondingly large Federal income tax which it is desirous of reducing by deductions of a so-called bonus. In other words, a bonus agreement may be a *nudum pactum* during a lean year but a deductible bonus in a prosperous year.

The plan has the merit of ingenuity, and it has more than mere ingenuity if it succeeds in permitting the taxpayer to reduce its income in a year when its profits are very large.