A. & M. Karagheusian, Inc. v. Commissioner.
A. & M. Karagheusian, Inc. v. Commissioner
Docket No. 109875.
United States Tax Court
1943 Tax Ct. Memo LEXIS 19; 2 T.C.M. (CCH) 1142; T.C.M. (RIA) 43520; December 24, 1943
*19 Pursuant to a plan to reward faithful and capable "key" employees for their services to the company, petitioner issued its certificates for class A stock to such employees in amounts determined by it and simultaneously required the employees to execute a repurchase agreement. The certificate holders had no vote, no absolute right to a share of the assets upon liquidation, and no share in profits in proportion to the "shares" held by them. The issuance of additional certificates was wholly within the discretion of petitioner. Current payments as so-called "dividends" were made from profits earned by petitioner during the service of each employee. The repurchase price was based on the earnings during each employee's period of service and the amount thereof was determined solely by petitioner. Current payments were designated "dividends" on petitioner's books. Held, that payments to employees and on repurchase settlements during the taxable year constituted additional compensation to the respective employees and were deductible from petitioner's gross income. Henry Mannix, Esq., 14 Wall St., New York, N. Y., for the petitioner. Clay C. Holmes, Esq., for the respondent. VAN FOSSAN *20 Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $3,702.34 and $1,243.78 in the petitioner's income tax and excess-profits tax liability, respectively, for the year 1939. The single issue is whether certain payments made by the petitioner in the taxable year to various of its employees and to the estates of two deceased employees were allowable deductions from the petitioner's gross income as additional compensation or were dividends and liquidating dividends, respectively. Findings of Fact The petitioner is a corporation organized in 1922 under the laws of Delaware. It is engaged in manufacturing, importing, dealing in, dyeing and cleaning carpets, rugs, floor coverings and other fabrics and materials. Its principal office is in New York City. It succeeded a partnership composed of Arshag Karagheusian, Miran Karagheusian and Vartan H. Jinishian. It filed its income and excess-profits tax returns for the year 1939 with the collector of internal revenue for the third district of New York. It kept its books and filed its returns on the accrual basis. The certificate of incorporation of the petitioner provided for four classes of capital stock: First *21 and second 7 per cent cumulative preferred stock; non-voting class A 8 per cent cumulative common stock; and voting class B common stock with cumulative dividends of $6 per year. The charter provided that the class A common stock was entitled to receive its 8 per cent cumulative dividends after the payment of the cumulative dividends provided for with respect to the first and second preferred stock. The charter further provided that after the class B common stock had received its cumulative dividends of $6 per year, the class A and class B common stocks were entitled to share equally in any further dividends. The class A and class B common stocks were issued for trade marks and good will of the partnership business. The class A stock was held originally by the three partners. Shortly after the corporation was created, as a means of providing an incentive to certain of its key employees, the three former partners, at the request of the corporation, transferred 1,640 of the total 2,400 shares of class A stock, in varying amounts, to such employees. No consideration was paid for the transfer. The three individuals wrote a letter to the corporation under date of June 25, 1922, surrendering *22 their class A common stock certificates and requesting the corporation to issue new certificates, up to 1,640 shares, to a list of named employees, and to return to themselves the remaining 760 shares. The letter specified that it was a condition of the transfer to the named employees that they sign a repurchase agreement at the time of the receipt of the stock. Subsequent to the transfer of the 1,640 shares, from time to time the three former partners transferred the remaining 760 class A shares held by them to the corporation and the corporation issued such shares to various employees under the same arrangement. The former partners received from the corporation for the 760 shares the same allocable part of surplus as would have been paid to employees for surrender of their shares. Therefore, as to the 760 shares, there was a purchase by the corporation. None of the employee recipients of the class A shares paid any consideration whatsoever for the transfer to them of the shares. The petitioner's purpose in giving the employees the shares of class A stock was to to permit them to share in the profits of the corporation. This purpose existed at the time of the formation of the corporation. *23 There was no intention of giving the employees any stock that would have any value in the ownership of the corporation. This purpose was effected by the issuing of the A stock certificates, subject to the execution and delivery of the repurchase agreement. The employees who were to receive A shares, and the number of shares to be received by them, was determined by the three former partners. Under the terms of the repurchase agreement each employee granted to the petitioner an "option to purchase" the stock, or any part thereof, at the termination, for any reason, of his employment. The "price" to be paid by the petitioner upon the exercise of the "option" was so much of the petitioner's surplus (including surplus capitalized) at the beginning or end of the fiscal year, whichever was nearer to the date of the termination of the employment, as was allocable to the particular shares, less a deduction for the amount of such portion of surplus existing at the date of the issuance of the stock to the employee. The agreement provided further that as nothing was paid for the stock the petitioner's computation of price was to be absolutely binding on the employee or his representative, *24 and that the certificate was to be stamped as desired by the petitioner to support the agreement. A revised form of agreement was adopted on December 30, 1922 and employees who had previously signed the old form signed a new form in lieu thereof. Each of the stock certificates issued to the employees bore a legend to the effect that the shares were subject to the agreement with the company and that the certificate could not be disposed of in any way. The stock certificate and the repurchase agreement contained the entire agreement between the company and the employee. All of the class A shares outstanding from December 31, 1931 to December 31, 1939 were held only by employees, subject to the repurchase agreement, or were in the treasury. Written repurchase agreements had been executed by all of the employees who received A shares, with the exception of Charles Karagheusian, who was the treasurer of the company and the son of one of the founders. However, his shares were held by him under an oral agreement subject to the same terms and conditions as the shares held by the other employees. A written agreement was executed by him in a subsequent year. During the year 1939, 4,910 class *25 A shares were outstanding. At the end of the year 4,784 of them were held by employees, a few of whom were also officers of the corporation, and 126 shares were held in the treasury. Of the 126 treasury shares, 104 were acquired in 1939 from the Estate of Khosrov Sarafian, an employee who died in 1938. During the year 1939 payments of two kinds were made in connection with the class A stock certificates held by the employees. Pursuant to a resolution of the directors, what was treated as an ordinary dividend on the books of the corporation was paid to the holders of the class A stock, the aggregate amount of the dividend being $14,277. In addition, in that year further payments were made to the estates of two deceased employees in connection with the reacquisition of their shares. One of the payments was in the amount of $5,415.28 for the surrender of 104 shares which had been held by Khosrov Sarafian. The other was in the amount of $8,351.20 and represented an adjustment of the payment to the estate of M. Henry Williams for the surrender of his shares in 1936. This payment was charged on the petitioner's books as a bonus salary payment. In order to determine the share of profits *26 to which an employee or his estate would be entitled upon termination of his employment and the surrender of his certificates, the petitioner's accountant, Daniel F. Kelly, prepared and maintained a statistical record book in which was kept a computation of the amount of surplus or surplus deficit allocable to each A share at the end of each year. This computation was made by giving a zero valuation to each share when it was received by an employee, by crediting the employee with his share of the profits when the company made money and by charging him with his share of the losses when the company lost money. From the statistical record book Kelly prepared an analysis of the surplus allocable to the various shares of class A common stock, showing the share of profits, if any, to which an employee might be entitled upon surrender of his certificates. Generally, the amount of surplus, if any, allocable to the particular share or shares of class A stock, as reflected in the surplus analysis, was the basis for settlement with an employee or his estate upon termination of employment and surrender of his certificates. In a few instances the company made adjustments to the amount of the *27 surplus allocable to an employee's shares, so as to pay the employee or his estate what the company deemed to be the allocable share of the true surplus rather than the surplus reflected in the corporate books. This occurred in years in which the corporation deemed that its assets were not actually worth their book value. One of such occasions was the payment to the Estate of Khosrov Sarafian of $5,415.28 in 1939, whereas Kelly's analysis indicated that surplus of $7,689.76 was allocable to the shares. The payment in 1939 to Estate of M. Henry Williams of $8,351.20, in addition to what had been paid in 1936, placed the surrender of his certificates upon the same basis as that of Khosrov Sarafian. This was done pursuant to the instructions of Miran Karagheusian, the company's president, who had been out of the country at the time of the original payment to the Williams' estate. Upon making such payment in 1939, a general release was obtained from the executors of Williams' estate. In one case, in order to avoid possible litigation, the company made a payment to George R. Snyder, a former employee, for the surrender of his certificate, even though the surplus analysis showed a minus *28 figure with respect to his shares. This was regarded as a nuisance payment to which Snyder was not legally entitled under the repurchase agreement. Each class A share outstanding did not have the same amount of surplus allocated to it as was allocated to every other class A share. Some had plus allocations at the same time that others had minus allocations. At the end of 1939 thirteen of the employees had deficits allocable to their shares while the remaining twelve employees had surplus allocable to theirs. Whether surplus or deficit was allocable to a particular share depended solely upon the period in which it was held and the profits or losses of the petitioner during such period. In 1939 and other years, while there were arrears of unpaid dividends on the first and second preferred shares, a dividend was declared on class A shares, the holders of the first and second preferred stock waiving their prior right to receive cumulative dividends. In order to encourage the holders of class A stock, the officers of the petitioner sought permission from the preferred stockholders to pay certain dividends on the class A stock. In all cases where the employment of a holder of class A *29 shares was terminated, by death or otherwise, the shares held by him during his employment were reacquired by the corporation. During the year in question none of the holders of class A shares, other than Charles Karagheusian, held any other stock of the company. The payments on the class A stock from the time of the issuance thereof down to the present time have been treated on the corporate books as dividend payments. Such payments have been voted by the corporation as dividends and the employees receiving such payments have reported them for income tax purposes as dividends. On the Federal income and excess-profits tax returns of the corporation for 1939 and subsequent years, these payments on the class A shares have been deducted as additional salary payments to the employees. Prior to 1929 Walter J. Corno, now the petitioner's treasurer, was associated with Price, Waterhouse & Co., the petitioner's auditors. At all times Corno believed that payments made to the employees holding class A shares were in fact additional compensation and should be so treated on the corporation's books and also for income tax purposes. No action was taken with respect to the question and it continued *30 to be solely a subject of discussion until the advice of counsel was obtained in connection with the 1939 return of income of the petitioner. Since 1939 in its income tax returns the petitioner has treated these payments as compensation but has continued to treat them on the books of record and in information returns as dividends, pending determination of the question. All of the items in question were deducted from the petitioner's gross income for 1939 as additional compensation for services. The $14,277 item was disallowed by the respondent as being a dividend. The $5,415.28 payment of Estate of Khosrov Sarafian was disallowed as being a liquidating dividend. In his amended answer the respondent claimed an increased deficiency for the $8,351.20 paid to Estate of M. Henry Williams, on the ground that it did not constitute a proper deduction from gross income within the purview of section 23 of the Internal Revenue Code. The respondent concedes that the amounts paid by the petitioner to its employees in wages and salary, plus the amounts in controversy, constituted reasonable compensation for their services. The statistical record recording the computation of the allocation of *31 surplus to various shares of class A stock issued from time to time is not an ordinary book of account in the same sense as a journal or ledger. It is, however, a part of the records of the petitioner. Where the record indicated a red figure, or deficit, against shares of class A stock, the employee would receive nothing upon the return of class A stock if he left the petitioner's employ. The individual checks, issued to each holder of class A stock for dividends reflected in petitioner's books, were separately drawn on one of petitioner's bank accounts. This practice was followed for 1939 and prior years. The certificates of class A stock were delivered to the various holders thereof and retained by them at all times after issue. The memorandum record was a distribution of the book surplus of the petitioner among the various classes of stock in accordance with the rights connected with these shares of stock. In arriving at the surplus allocations, the provisions of the petitioner's charter with respect to the rights to dividends were applied. When adjustment was made in the final payments to the estates of Sarafian and Williams, the difference between the amount shown in the memorandum *32 book and the actual payment was distributed to other shareholders in the next surplus adjustment. In making the allocation of surplus no consideration was given to salaries paid to the various holders of class A stock. The amount of class A stock given to an employee was measured by the value of his services to petitioner. The class A stock given to Charles Karagheusian was given with the understanding that when he no longer needed the income of this particular stock it would be given to other deserving employees. Opinion VAN FOSSAN, Judge: The petitioner contends that the payments in controversy were in the nature of additional compensation to the recipients and hence deductible from its gross income. In support of its position it argues that the issuance of the class A stock certificates, coupled with the repurchase agreement, created an employees' profit-sharing agreement and that the character and legal significance of such an arrangement were not affected by either the form adopted or by inconsistent bookkeeping entries. It is admitted by respondent that the aggregate of the salaries paid as such and the additional amounts would constitute reasonable salaries for services *33 performed. The respondent also admits that the fundamental legal rights of the parties under the contract in its entirety are controlling and that neither the form of the arrangement nor bookkeeping entries relating to the contract are determinative. He contends, however, that the holders of the class A certificates were in fact stockholders and enjoyed certain rights and prerogatives peculiar to that relationship. He argues further that his view is confirmed by the petitioner's acts and by its treatment of the controverted payments since 1922. The soundness of petitioner's argument that book entries are not conclusive is so clear as to require little discussion. It matters not that petitioner may have treated the original transaction with its employees on its books as the issuance of corporate stock to them, and the regular yearly payments to them as dividends thereon. If the petitioner's conception of the situation was in fact erroneous it is not precluded from establishing its real tax basis, even at this late date. The basic question is whether the petitioner is properly entitled to a deduction because of the inherent nature of the transaction. As we view the record, it is *34 unmistakably clear that the petitioner's officers desired to express their recognition of and reward for the faithful, efficient and loyal service of certain employees who occupied "key" positions in the enterprise. They also planned to encourage and incite such employees to greater endeavors on behalf of the company. To that end they caused the petitioner to issue certain certificates called "class A stock" to evidence the results of the employees' efforts. They reserved the right to determine which of their employees were entitled to the certificates, the number of "shares" to be issued to each, and the amount of return or "dividends" to be paid. The petitioner issued the certificates to those employees whom it deemed entitled thereto by reason of their efficient and exceptional service and also increased the stockholdings of those already so rewarded whenever the character and extent of additional service merited such action. The possessors of the class A stock had very few, if any, of the rights of corporate stockholders. They could not vote; they had no absolute right to a share in the assets upon liquidation; they were not entitled to an aliquot part of the earnings upon repurchase *35 by the corporation; and they were bound to accept without question the computation of the repurchase price as made by the petitioner. The so-called stock certificates and agreement to repurchase were both integral parts of the transaction by which the employees acquired their class A stock. The certificate bore on its face the statement that it was subject to the repurchase agreement and was not "to be disposed of in any way." The repurchase agreement referred to, and was predicated on, the transfer of the stock. The two documents were interdependent. At the time of acquisition, we have no doubt that the certificates constituted an additional compensation or bonus. The employees paid no money to the petitioner therefor. The annual payments, termed "dividends" on the petitioner's books, which accrued and were paid on the stock present a slightly different question. Of course they actually would be dividends if the "stock" held by the employees represented a real stock interest in the petitioner corporation. However, the limitations of the repurchase agreement and the method of computing the value of the stock transformed an orthodox dividend into a sharing of current net profits *36 measured by that portion of the petitioner's surplus earned during the period the employee held the certificate. Thus the payments on various certificates were not uniform. The scheme adopted by the petitioner is unusual but fundamentally it served a dual purpose; first, as a means of accumulating for each employee certificate-holder a fund payable upon the termination of employment and based on the earnings of the company for the period during which each share was held by the employee. Second, it was a vehicle paying currently the profits of the company earned while the employee was contributing thereto. Both phases of its operation were present during the year under consideration. We have been able to find in the reported cases no plan precisely like that before us. The petitioner cites Thomas A. Hunter, Jr., 33 B.T.A. 941; Indianapolis Glove Co. v. United States, 96 F.2d 816; United States Steel Corporation, 2 T.C. 430; and other cases in support of its position. These decisions are authority for the principle that the agreement must be read as a whole. Holding as we do that the *37 certificate and repurchase agreement in the case at bar were constituent parts of the arrangement between the petitioner and its employees, we conclude that the parties thereto both intended and effected a plan to pay additional compensation to the employees and that the amounts so paid as "dividends" during the taxable year were not dividends in fact but were additional compensation. The amounts so paid were deductible from the petitioner's gross income for that year. The facts in Kennington Realty Co., 8 B.T.A. 1030, and Kennington v. Donald, 50 F.2d 894, certiorari denied, 284 U.S. 664, 76 L. Ed. 562, 52 S. Ct. 40, relied upon by the respondent, vary fundamentally from those in the case at bar and hence are distinguishable. Decision will be entered under Rule 50.