**BRASSERT v. CLARK.**

No. 278, Docket 20574.

Circuit Court of Appeals, Second Circuit.

July 30, 1947.

George B. Searls, of Washington, D. C., David L. Bazelon, Asst. Atty. Gen., Adrian W. Maher, U. S. Atty. for the Dist. of Connecticut, of Hartford, Conn., Harry LeRoy Jones, Sp. Asst. to the Atty. Gen., George W. Jansen, Chief Trial Atty., and Samuel Z. Gordon, Atty., Dept. of Justice, both of Washington, D. C., for appellant.

Bernard Phillips, of New York City, Scandrett, Tuttle & Chalaire, of New York City, for appellee.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a judgment for the plaintiff in an action brought under § 9(a) of the Trading with the Enemy Act.[1] The only question is whether the district judge's findings were "clearly erroneous" that the enemy-owned property seized by the Property Custodian had been lawfully transferred to the plaintiff, an American citizen, and belonging to him when seized. The Custodian's vesting order of January 6, 1943 vested in himself "All right, title and interest of Askania-Werke A. G., in and to a contract dated July 5, 1939 with Askania Regulator Company * * * granting a license to Askania Regulator Company with respect to certain patents and applications therefor, together with all monies, credits, royalties, fees, and other amounts due and payable with respect thereto." The plaintiff's position was that Askania-Werke A. G.—which we shall speak of as "Askania"—had on April 15, 1941, transferred to him the license agree-

[1] Title 50 U.S.C.A. War Appendix, § 9(a).

968

ment of July 5, 1939; the defendant's position was that neither on that day, nor at any other time before June 14, 1941, when all transfers of German property became unlawful,[2] had "Askania" transferred the agreement; and that, if it had, the transfer was colorable and only a cover for a re-transfer to "Askania" after the war. The judge found against the defendant on both issues, upon evidence the substance of which is as follows.

The plaintiff was a consulting engineer in the iron and steel industry; "Askania" was a German corporation which made automatic precision control instruments, used in the manufacture of steel, and had a number of patents in that and other fields. The plaintiff became acquainted with these instruments in 1925 and, believing that they would be acceptable in this country, became "Askania's" exclusive representative in 1929. From then until 1933 "Askania" shipped its wares to this country, where they were assembled and sold. In that year, and until 1936 it began to manufacture by a wholly owned subsidiary Texas corporation; after 1936, and during all the times here in question, it manufactured by an Illinois corporation, Askania Regulator Company—which we shall speak of as "Areco." "Askania" caused all the original 500 shares of "Areco" to be issued to the Texas corporation; but at once thereafter the plaintiff bought fifty shares at $100 a share, and "Askania" agreed to pay him a commission on all sales for twelve years, up to a gross amount of $150,000. Between 1937 and 1939 the plaintiff, through a corporation which he controlled bought 250 more shares of "Areco" which had been issued in addition to the first 500; so that either directly or indirectly in 1939 he owned 300, and "Askania," 450, of the 750 outstanding shares. On July 5th of that year "Askania" and "Areco" executed a contract, superseding an existing one, by which "Askania" promised to furnish "Areco" with all its designs, manufacturing details and "experience" "regarding regulators and other thermo-dynamic controls of all types for free and exclusive use within United States * * *" Some of

these "designs" were covered by United States patents issued to "Askania," and the contract gave "Areco" "an exclusive right to these patents limited to controls and other thermo-dynamic equipment of all kinds." "Areco" promised on its part to pay a graduated scale of royalties and to account monthly; also to take charge of applications for patents in the United States upon inventions of "Askania," of which however both parties were to bear equally the expenses. "If Areco or their employees make inventions in the field covered by this agreement, these inventions are the exclusive property of the Areco. Areco is entitled to apply for U.S.A. Patents and retains all rights to these patents within U.S.A." This contract was to come to an end on March 4, 1948; and "at the expiration of this agreement Areco has the right to continue to use U.S.A. patents of the Askania-Werke in the field covered by this agreement until the expiration of such patents * * *"

On July 5, 1939, when the contract was made, it was obvious to the plaintiff, to "Areco" and to "Askania" that war was imminent; and the plaintiff who had for some time wished to get control of "Areco," began negotiations for the purchase of "Askania's" 450 shares. In February, 1940, he offered $10 a share for them, with an option to "Askania" to re-purchase them after the danger of war had passed. "Askania" refused; and on April 19th of that year wrote to "Areco"—not the plaintiff— that a colorable sale of its shares would not satisfy it, and that nothing would do except a genuine sale of its entire interests in "Areco," including the license agreement and the patents. "Askania" set a price of $200,000 for these properties, and suggested that "Areco" try to interest two American companies, which "Areco" unsuccessfully tried to do. On June 21st, "Askania" wrote to "Areco," saying that from "Askania's" experience in its Paris office (Germany had by that time occupied France), "it would be useless to effect a sale disguised by some means, in order to protect our property in the U.S. * * * If it should surrender its shares at a nominal

[2] Executive Order No. 8389, 5 Fed. Reg. 1400, as amended by Executive Order No. 8785, 12 U.S.C.A. § 95a note, 6 Fed.Reg. 2897.

price now, Askania thought they would be confiscated as they had been in France. The lawyers' opinion which you enclose fails to eliminate our misgivings." On the 27th, "Askania" wrote to the plaintiff, saying: "It was proposed that a cloaked sale of our shares of stock be carried out. We do not see this as a solution however as the sale would not be for an equivalent value. * * * I believe I can obtain approval from the German Government for a suitable proposal even if what is involved is merely a formal action. This formal action, however * * * would have to be based on an exchange of equivalent values." The plaintiff did not learn of this proposal, until he came back from South America on August 7th, when he cabled his agents in Germany asking them to arrange to buy out the "Askania" interest for 500,000 marks, to be paid out of his personal and company account in Germany. He got no answer until October 22nd, when "Askania" cabled him as follows: "Your Berlin office declares that no equivalent for Areco shares available Stop Suggest to value Areco shares including license agreement and patents at one hundred fifty dollars Stop Ready to take in exchange house Grunewald Kronenbergerstrasse * * *" Plaintiff on the same day answered by cable: "* * * Your proposition in cable October twenty-second accepted. You, vom Berg and Fuerstenau please confirm." Vom Berg and Fuerstenau were the plaintiff's agents in Berlin; with what authority we reserve for the moment.

On December 7th, "Askania" applied to the German authorities for approval of the sale; and on January 21st, a license was granted. It was subject to a condition, which, as amended on January 31st, read as follows: "In consideration of the fact that this exchange is to be carried out only for security, this permission is granted on the condition that the whole transaction will be cancelled again after the end of the war. However, explicit reservation is made of the right to demand, subsequently, the delivery of the amount corresponding to the exchange value of the acquired premises * * * to the Deutsche Golddiskontbank * * * or the transfer of the premises to the Reich, in case the trans-

action, contrary to expectations, is not canceled after the end of the war; unless it is proved that you have left nothing undone to obtain the cancellation of the exchange transaction after the war." The judge found that this condition was exacted by vom Berg and Fuerstenau in Berlin without the plaintiff's knowledge in the hope of protecting his interests in the Grunewald property if Germany won the war. In September, 1939, the plaintiff had given a power of attorney to vom Berg and Fuerstenau in the broadest terms; but at the trial the plaintiff and vom Berg both testified that all three understood that the agents were authorized only to carry on negotiations for a new contract between a German corporation which the plaintiff controlled and another German corporation, relating to the accounts between the two. Vom Berg testified that he and Fuerstenau had never shown the power to "Askania" and the plaintiff testified that, when the plaintiff on October 22nd cabled that the agents should "confirm," he only meant that they should draw up the papers. The judge found that this testimony was true.

On April 11th, "Askania" sent to the plaintiff the following telegram: "We hereby sell and transfer to you all our holdings of the Askania Regulator Company that is four hundred fifty shares of said company including rights of license agreement with Areco dated July 1939 but excluding trademark Askania Stop Kindly cable acceptance in such form that this sales agreement is definitely closed Stop We receive here payment in full by your agents Brassert and Company who turn over to us building Kronenbergerstrasse Stop For this deal we secured all necessary permits by German Government." The judge found that at the time of sending this cable "Askania" knew that the plaintiff had not authorized vom Berg and Fuerstenau to agree that the exchange should be reversed after the war. Plaintiff answered on April 15th: "Hereby accept exchange Askania shares for property on terms and conditions contained in your telegram April eleventh." On April 22nd, "Askania," having received the plaintiff's cable, answered: "We hereby inform you that Askaniawerke Berlin have transferred to you

personally April eighteenth the Areco certificate number nine * * * covering the number of four hundred fifty shares * * * The Areco certificate number nine is despatched." On the 18th plaintiff sent to "Askania" a written contract in which "Askania" cransferred co him certificate number nine, the patents and. patent applications listed in an annexed schedule, and all "Askania's" "right, title and interest in the * * * agreement * * * dated July 5, 1939." This was in exchange for the Grunewald property, and a cancellation of the "Areco" trademark in the United States. To this proposed contract "Askania" gave no answer until August 6th, when it imposed as conditions upon acceptance (1) that the patent rights should .revert to it when the license agreement terminated; (2) that it should retain free use of the patents "outside Province of Areco program"; and (3) that the plaintiff should take care of all pending applications for patents. The plaintiff answered on August 12th, that his acceptance of this offer had already created a valid contract; that he had in accordance therewith cancelled the "Areco" trademark; that he would bear all the expenses of the patent applications assigned; and that it was imperative that the written contract should be signed·and acknowledged. Considerable correspondence ensued, the parties being in dispute as to how many paténts were covered, but on September 18th "Askania" cabled: "* * * we signed agreement of April eighteenth and transferred to you all patents and applications pending belonging to the present field of activities of Areco Stop But we are not able to transfer patents not belonging to Areco activities because this would damage our future American business in our other lines Stop Cable agreement." On the next day plaintiff cabled: "Hereby agree accept transfer patents belonging field Areco activities accordance your cable September eighteenth Stop Please forward to me immediately signed agreement dated April eighteenth and cable date mailed."

The judge found that a contract had been made by the cables of April 11th and April 15th; that it was a bona fide sale, not a cloak or sham, or made with intent to defraud the United States or in furtherance of any conspiracy with "Askania"; and he therefore revested the license agreement as of April 18, 1941, together with the royalties which had accrued under it from chat date to August 31, 1944.

The first question is whether the parties had come to an agreement before June 14, 1941, definite enough in its terms to give the plaintiff a claim upon the license agreement of July 5, 1939. The defendant says that, although "Askania's" offer by cable of October 22, 1940, included its American patents, yet, even though the plaintiff accepted that offer unconditionally, the details had not been finally arranged. We assume as much, for the cables of April 11, and April 15, 1941, leave no doubt that up to that time the parties had not supposed that a contract had been concluded, and indeed the plaintiff does not claim that one had been: he relies upon the cables of April. To this the defendant answers that in "Askania's" cable of April 11th no mention was made of patents and that none is to be implied; and it argues that this was concededly a term which had to be agreed upon for the plaintiff himself asserts that the contract did include patents. For the following reasons we think that both parties understood that the patents were included. The license agreement was to last for about nine years, and it necessarily followed that it conveyed all the beneficial interest which "Askania" had in those patents which would expire before March 4, 1948; as to these the transfer of the patents was merely a matter of form. Although many of the patents would not expire by March 4, 1948, the two "basic" ones expired in 1950 and 1951; and, especially we should remember that "Areco" had the right under the contract of July 5, 1939, to continue to use the patents until they expired, though upon newly negotiated royalties. Perhaps this extended use was not "exclusive," but in any case what value remained would not be great. Moreover, nothing had happened since October 22nd to advise the plaintiff that such a modification was intended; and, if it had been, there was no reduction in price to justify it. Again, as Hincks, J., particularly observed, it is most unaccountable that, al-

though "Askania" did except its trademark in April, which it had not done in October, it said nothing about patents. It is true that on August 20th "Askania" cabled the plaintiff that its "offer * * * neither included property of patent rights nor did your answer demand it. * * * Transfer of patent rights forever for us impossible unless you agree to reassign to us at any time and to send agreement binding you and your successors." Although this was not of consequence, being only a unilateral interpretation of the agreement, it might have become a practical construction, if the plaintiff had assented to it. That in fact the plaintiff had not so understood the agreement appears from his letter of August 22nd to "Areco"; but that too would be immaterial, the meaning of a contract to the parties, as a matter of their mental history, not being of importance. When, however, on September 15th the plaintiff came to answer "Askania's" cable he said that the reassignment suggested was impossible—which standing alone might seem to assent to "Askania's" construction—but he concluded that the "binding agreement dated April 18th exists and provides for unconditional assignment patents." That was plain, and to this construction "Askania" assented by cable on September 18th, only excepting "patents not belonging to Areco activities," which nobody included, and which apparently had been all along the only difficulty. In this exchange appears a practical construction of much importance, bearing out the plaintiff's position; and for all the foregoing reasons we hold that patents were included.

The defendant is on stronger ground in arguing that the parties had not agreed upon what patents should be included. The list which the plaintiff proposed in the contract of April 18th, "Askania" did not accept, and when the parties came to a final settlement in September, they omitted a great number of them. That dispute did not, however, prevent a contract being made upon April 15th, if the parties had agreed upon a standard or test, which was at once independent of their future mutual consent, and which would determine what patents were to be transferred.[3] The fact that they later did not agree in the application of the standard is immaterial. There was such a standard. The contract of July 5, 1939, declared that a list of patents, issued and pending, was annexed, but apparently none ever was. The patents licensed were described merely as "patents limited to controls and other thermo-dynamic equipment of all types"; and later along, in the provision which dealt with the handling of applications whose expenses the parties were to share, they were described as "inventions of the Askania-Werke in the field of activity covered by this agreement." On the other hand, all inventions discovered by "Areco" or its employees were to belong to "Areco," and "Areco" was to pay for getting them out. It therefore became necessary to make a division of patent expenses in the accounts between the two companies; and Niemann, "Areco's" secretary, testified that in practise the patents were divided into three groups. One of these, "Group A", was of patents upon inventions of "Areco" or its employees; another, "Group B", was of those which "Areco" regarded as "limited to controls or other thermo-dynamic equipment of all types," and therefore in its "field of activity." "Group C" were those which were in fields where "Areco" was not "active," and with which it had no concern. All patents in their specifications set forth the disclosure; usually they begin with a statement of the uses to which the disclosure may be put. "Areco's field of activity" was the kind of manufacture it was engaged upon in 1939; and it does not seem to us an insurmountable task, by comparison of the specifications of a given patent, to decide whether it was within the "field of activity," so defined. The business had been in existence six years and its history told something; the parties in

---

3 Moon Motor Car Co. of New York v. Moon Motor Car Co. Inc., 2 Cir., 29 F. 2d 3; Ken-Rad Corporation v. R. C. Bohannan, Inc., 6 Cir., 80 F.2d 251; Pennsylvania R. Co. v. Huston, 6 Cir., 81 F.2d 704; Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618; A. M. Webb & Co. v. Robert P. Miller Co., 3 Cir., 157 F. 2d 865; Stern v. Premier Shirt Corporation, 260 N.Y. 201, 183 N.E. 363; Restatement of Contracts, § 32; Williston on Contracts, § 47.

their accounting must have applied the standard; and of course it was a standard independent of their "will, wish and want." We think that it was also certain enough to determine whether the contract had been performed; in other words, whether, if the parties disagreed, a decision between them could be rationally made; courts repeatedly administer quite as indefinite standards. We hold that a valid contract was made on April 15, 1941.

The remaining question is whether "Askania" and the plaintiff tacitly incorporated into the contract an agreement that after the war the transfer should be reversed and the parties restored to their original position. A strong argument can be made that they did. It starts with the plaintiff's offer of February 17, 1940, to buy the 450 shares of "Areco" held by "Askania" for $4500, in which he expressly incorporated the privilege of re-purchase. ("Areco" had itself already made the same offer in its cable to "Askania" of January 27, 1940). However, by April 19th, "Askania" appears finally to have rejected any sham transaction: "transfers of the shares, or also of the patent rights, of a purely formal kind, will have no purpose. If it is desired to sell, a real sale to the company with patents would have to be undertaken." It placed a value of $200,000 on its interests, and suggested opening negotiations with two named corporations. "Areco's" answer on May 21st was in accord; apparently both had at that time given up any thought of the sham transaction. "Askania's" letter to "Areco" of June 21st continued in the same vein; at least, it contained no suggestion of any rescission; and a copy of that letter "Askania" enclosed in its letter to the plaintiff of June 27th. However, the letter to the plaintiff did itself seem to resume the plaintiff's original suggestion. True, in speaking of a sham sale it said: "We do not see that as a solution however, as the sale would not be for an equivalent value." But later it went on to suggest "making a formal exchange of our assets in Chicago for assets that you have here in Berlin," and to say "that now a decision must be made as to whether we make a formal exchange or not." It thought that it could

obtain approval from the Reich "even if what is involved is merely formal action," except that that action "would have to be based on an exchange of equivalent values." "Formal" in this letter would seem to mean "sham": it had been so used earlier. The plaintiff did not learn of these letters until he returned from South America on August 7th, but on that day he cabled Fuerstenau asking him whether he could arrange for the sale in consideration of 500,000 marks to be taken out of his German mark account; and he testified that he had not understood the letter of the 27th to propose a sham transaction. The next important document was "Askania's" cable to the plaintiff on October 22nd, which contained no suggestion of a rescission and which the plaintiff at once accepted. That cable also shows that he left it to "Askania's" president, vom Berg and Fuerstenau to "confirm." Vom Berg's testimony was that he understood that this only gave him and Fuerstenau power "to do the necessary things in order to have the property transferred to Askania-Werke"; but not to change the contract itself.

We omit for the moment a consideration of the effect of what vom Berg and Fuerstenau actually did thereafter in Berlin. The plaintiff testified that he did not know of their negotiations with "Askania"; and his wire to vom Berg and Fuerstenau of November 23rd does not suggest that he had given them general authority; they were to "confirm" the sale and to "agree in best interest of all to transfer. Grunewald property for the Askania Regulator Company's shares now held by Askaniawerke in settlement of all monies owed * * * (him) for services plans specifications patents." We are therefore to take it that the plaintiff was privy to nothing until "Askania's" cable of April 11, 1941, which on its face made an unconditional offer. Also in the proposed contract of April 18th, which the plaintiff sent on to implement his cable of April 15th, there was no suggestion of rescission; and, as Hincks, J., well observed, from then forward both parties keenly asserted their conflicting interests. It is scarcely possible that, had they all along been proceeding under a merely protective or "cloaking" arrange-

ment, they would have adopted toward each other this competitive attitude, which continued all through the summer of 1941, until finally they composed their differences. While it would not perhaps have been unnatural that in the formal contract of April 18th they should have suppressed such a collateral understanding, for they might have wanted an unblemished record if the transfer were ever challenged, the defendant has not suggested, nor do we see, why in straightening out the details, they should, not only have not even alluded to an agreement which made all the bickering idle, but why they should have bickered at all. The only rational explanation, consistent with the defendant's position, is that the whole correspondence was staged: an elaborate facade to throw off pursuit. If it was, both sides were masters of dissimulation.

However, it appears from vom Berg's testimony that he did agree with "Askania" that the whole transfer should be reversed after the war, if Germany should win—which was the only contingency the parties cared about. In that event, vom Berg wished the plaintiff's German company to regain the Grunewald property, and we assume, arguendo, that he could not have expected "Askania" to reconvey it, unless the plaintiff on his part also restored the "Areco" property. We shall therefore take it as true that vom Berg and Fuerstenau made such an agreement with "Askania," and we shall also assume for argument that this would have invalidated the transfer, even though Germany lost the war; in other words, that, although, as between the parties the condition never came into effect, it was an unlawful contract under the Trading with the Enemy Act. However, we think that vom Berg and Fuerstenau did not have authority to change the proposed terms in this way. As to this it is necessary to go back to September 13, 1939, when, in response to a cable from Fuerstenau, the plaintiff gave him and vom Berg their original authority. The plaintiff had then been negotiating with a German corporation for some time about a claim for services rendered; and Fuerstenau cabled

to get authority to close the dispute. The plaintiff answered on the same day as follows: "I give you herewith full authority to act for me in transfer our contract to buyer you retaining for me independently or jointly with friendly concern our outside business." The rest of the long cable is confined to the same dispute. On the same day the plaintiff cabled also to the "buyer"—one, Pleiger, who represented the German corporation—that he had given Fuerstenau and vom Berg authority to act for him. On September 22nd, he sent the formal power of attorney which we have already mentioned, with a covering letter in which he said that they were to act severally or jointly "in all matters which may arise in regard to my personal affairs or my business in Germany."

It is well settled law when a written power of attorney contains within itself authority to deal with a specific subject, that, even though it also contains words in the most general terms extending the agent's authority, that authority does not go beyond the specific subject.[4] Thus if the contents of plaintiff's cable of September 13th had been physically incorporated into the formal power of attorney, there would be no doubt that vom Berg's and Fuerstenau's authority would be limited to the negotiations with Pleiger. We regard the situation as the same as though that had been done; there can be no doubt that the purpose on the 13th was to allow the two agents to settle with Pleiger. Obviously nothing had happened between that day and the 22nd to induce the plaintiff to extend their powers; the sale of the "Areco" had not yet been bruited; so far as appears, the plaintiff had no other negotiations under way. Why then should not all the documents which expressed the actual intent be read together? As between the principal and the agents, the power of attorney may have been an "integrated memorial" of their agreement; we will assume that the parol evidence rule applied to it. However, that rule does not prevent the entire intent of the parties from appearing—so far as it has been actually expressed—when that intent becomes relevant

---

4 Restatement of Agency, § 37(1), Illustrations 1 and 2.

974

in a transaction between either party and a third party.[5] That is the situation at bar. Of course, if vom Berg and Fuerstenau had showed the power to "Askania," the plaintiff would have been estopped because their apparent authority would have covered what they agreed to: but vom Berg testified that they never did show it to "Askania." And, indeed, for the reasons we have already given at length, the later conduct of "Askania" shows that, whatever the agents said, it did not suppose that they had modified the plaintiff's right to treat the transfer as irrevocable.

Judgment affirmed.

---

[5] Indianapolis Glove Co. v. United States, 7 Cir., 96 F.2d 816, 819; Patterson v. Texas Co., 5 Cir., 131 F.2d 998, 1001; Stern v. Commissioner, 2 Cir., 137 F.2d 43, 46; White v. Union Producing Co., 5 Cir., 140 F.2d 176, 179; Wigmore, § 2446.