William J. **SULLIVAN** and Georgia K. Sullivan, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

**Civ. A. No. 14661–4.**

United States District Court
W. D. Missouri, W. D.

June 29, 1965.

§

Harry A. Morris, Claude R. Sanders, of Morris, Sanders, King & Stamper, Kansas City, Mo., for plaintiffs.

F. Russell Millin, U. S. Atty., John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Jerome Fink, Chief, Refund Trial Sec. 3, John M. Bray, Attorney,

Tax Division, Department of Justice, Washington, D. C., for defendant.

BECKER, District Judge.

This is an action by plaintiffs William J. Sullivan and Georgia K. Sullivan, his wife, to recover federal income taxes and interest thereon, alleged to have been erroneously assessed and collected by the defendant. There has been compliance with all statutory conditions precedent to filing of this action. Jurisdiction to determine this controversy exists under Section 1346(a) (1), Title 28, U.S.C.A.

The plaintiffs filed a timely joint federal income tax return for the calendar year 1956. Thereafter, the District Director of Internal Revenue determined that the plaintiff William J. Sullivan received during the year 1956 additional income equivalent to a dividend, in the amount of $198,334.58 from the Sullivan-Nelson Chevrolet Company, a corporation (hereinafter designated the "corporation" regardless of changes in name), as a result of the purchase or redemption by the corporation of the stock in the corporation owned by Frank W. Nelson. On the basis of this determination, additional income tax for the year 1956 in the sum of $150,166.55, plus accrued interest in the sum of $53,150.70, was assessed against the plaintiffs. Payment of the additional tax and interest was made by plaintiffs on or about March 8, 1963, in the sum of $203,317.25. Thereafter, on March 26, 1963, plaintiffs received a refund in the amount of $98.81 on the ground that the original assessment was incorrect to that extent. The amount now in controversy is the net payment of $203,218.44, plus interest.

*Question for Determination*

The sole question for determination in this action is whether the plaintiff William J. Sullivan received income equivalent to a dividend (a constructive dividend) in the amount of $198,334.58 during the taxable year 1956 when the corporation purchased or redeemed the shares of stock therein owned by Frank W. Nelson.

*Applicable Statutory Provisions*

The statutory provisions applicable in the determination of this action are the following portions of Sections 302 and 316 of the Internal Revenue Code of 1954 (Sections 302 and 316 of Title 26, U.S.C.A.):

"§ 302. Distributions in redemption of stock

"(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

"(2) Substantially disproportionate redemption of stock.—

"(A) In general.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

"(B) Limitation.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

"(C) Definitions.—For purposes of this paragraph, the distribution is substantially disproportionate if—

"(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

"(ii) the ratio, which the voting stock of the corporation owned by the shareholder immediately before the redemp-

tion bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

"(D) Series of redemptions.— This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

"(3) Termination of shareholder's interest.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder."

"§ 316. Dividend defined

"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, or

"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."

*Regulations and Revenue Rulings Relied on by Plaintiffs*

In support of their claim for relief, plaintiffs rely upon the following Income Tax Regulations under the 1954 Internal Revenue Code: Sections 1.302–1, 1.316–1, and 1.317–1. Since this case is decided upon the statutes involved and the judicial decisions construing the statutes, and since there is no disagreement concerning the interpretation of the regulations, the regulations will not be set out in detail.

The Revenue Rulings relied upon by the plaintiffs are as follows: Revenue Ruling 614, 1958–2 Cum.Bull. 920 and Revenue Ruling 286, 1959–2 Cum.Bull. 103.

FINDINGS OF FACT

In February 1941, the plaintiff William J. Sullivan (hereinafter designated "Sullivan"), a resident of Kansas City, Missouri, acquired a Chevrolet franchise in Blytheville, Arkansas. In the same month, to exploit the franchise, Sullivan formed the Loy Eich Chevrolet Company, an Arkansas corporation, with its principal place of business in Blytheville, Arkansas. Its authorized capital stock consisted of 1,000 shares of common stock, having a par value of $100 each. The corporation commenced business upon the issuance of 300 shares of its capital stock, which was issued at par value. Its initial shareholders were plaintiffs Sullivan and Georgia K. Sullivan (hereinafter designated "Mrs. Sullivan"), holding 290 shares, and Loy B. Eich and Ruth Eich, holding 10 shares. The name of the corporation, Loy Eich Chevrolet Company, was changed on February 21, 1948, to the Sullivan-Nelson Chevrolet Company, and thereafter again changed on May 8, 1956, to the Kaw Finance Company.

In 1941, Loy B. Eich (hereinafter designated "Eich") was employed as resident manager of the corporation, and continued to manage the corporate business until February of 1948. Between 1941 and 1948, Eich acquired by purchase an additional 110 shares of stock in the

corporation so that his total holdings in February of 1948 were 120 shares, which were 40 percent of the outstanding 300 shares. On March 17, 1946, Eich (then owning 30 percent of the stock of the corporation) and Sullivan (then owning or controlling through his and his wife's ownership 70 percent of the stock of the corporation) entered into a written agreement whereby Eich acknowledged that the Chevrolet franchise for Blytheville, Arkansas, and contiguous territory was the individual property of the plaintiff Sullivan, though nominally owned by Sullivan and Eich. In the written agreement, Eich further agreed to surrender the stock in the corporation owned by him, upon demand by Sullivan at any time in the future, and further agreed to sell his stock to Sullivan at its net worth and book value determined from the company's books and financial statement.

In February 1948, Sullivan purchased all the shares in the corporation owned by Eich and his wife. Following this purchase Sullivan and Mrs. Sullivan owned all the issued and outstanding capital stock of the corporation, a total of 400 shares. Sullivan then entered into negotiations with Frank W. Nelson (hereinafter designated "Nelson") to secure Nelson's services as resident manager of the corporation. Nelson had been employed since 1944 by Sullivan as general manager of a Chevrolet dealership in Kansas City, Missouri.

After negotiations, Sullivan and Nelson entered into a written contract dated September 10, 1948, signed by Nelson on September 10, 1948, and by Sullivan on September 14, 1948 (Plaintiffs' Ex. 4). The material provisions of this contract (hereinafter designated "memorandum agreement") are as follows:

"MEMORANDUM AGREEMENT

"This agreement made and entered into this 10th day of September, 1948, by and between William J. Sullivan of Kansas City, Missouri hereinafter called 'Sullivan' and Frank Nelson of Blytheville, Arkansas, hereinafter called 'Nelson', witnesseth:

\* \* \* \* \* \*

"WHEREAS, Loy B. Eich has since retired from the business and severed his connection with the corporation and sold and transferred his stock in the Loy B. Eich Chevrolet Company to said William J. Sullivan and the corporate name has been changed to Sullivan-Nelson Chevrolet Co.; all of the stock of the corporation is owned by William J. Sullivan and Georgia Sullivan except one qualifying share owned by the undersigned, Frank Nelson, and

\* \* \* \* \* \*

"WHEREAS, said Nelson desires to purchase shares of stock in the Sullivan-Nelson Chevrolet Co. and own said shares as long as he is living and physically capable of managing and is manager of said company or of said corporation, and Sullivan desires to sell and transfer some shares of stock to said Nelson as herein provided and upon the following terms and conditions.

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

\* \* \* \* \* \*

"4. ACQUISITION OF SHARES OF STOCK BY NELSON. Said Nelson desires to purchase shares of stock in the corporation as aforesaid and now has the sum of seventeen thousand, five hundred dollars ($17,500.00) for such purpose, and desires to purchase at book value such number of shares of stock as said amount of money will purchase. In determining the value of shares of stock at this time, or at any time in the future, and in now determining the amount which said Nelson shall pay for such shares, the parties have agreed on the rule of book value and book value is defined as follows: 'The capital, the surplus, and the undivided profits, divided by the number of shares issued and outstanding.' \* \* \* Nelson may

acquire up to but not more than forty (40) per cent of the stock of the corporation issued and outstanding, after the issue of such stock to him.

"5. HOW VALUE OF STOCK AND PRICE AS TO PURCHASE AND SALE IS DETERMINED. The price of a share of stock in the corporation when purchased or sold by Nelson shall be determined from an adjusted monthly financial statement as of the close of business as of the last day of the preceding month. Such statement shall be used by the parties including their heirs, executors, and administrators in determing (sic) the book value of the stock as defined in paragraph four above.

"6. TRANSFER OF SHARES OF STOCK. It is understood and agreed that Sullivan is permitting Nelson to buy stock in said corporation for the purpose of giving him a working interest only, and said Nelson agrees that said shares of stock cannot and will not be mortgaged, hypothecated or transferred by him, his heirs, executor, administrator or trustee to any person other than William J. Sullivan or such person as said Sullivan directs in writing. Any such sale, delivery or transfer to any other person, firm or corporation shall be null and void. Said Sullivan agrees that he will, within thirty (30) days after such shares have been offered for sale to him, accept the offer to sell, provided always that such shares shall be offered for sale at a price to be determined according to this contract.

"7. TERMINATION OF CONTRACT. Said Nelson agrees that if he should terminate his employment or relationship with William J. Sullivan or employment by the said corporation, and if his connection and association with the corporation should cease or be terminated by Sullivan or the majority owners of the stock of the corporation, then said Nelson agrees to sell and transfer and deliver to Sullivan at the then book value all shares of stock owned by him in the Sullivan-Nelson Chevrolet Co. * * If said contract is terminated by Nelson or Sullivan as herein provided or by the death of Nelson, the value of the stock owned by Nelson shall be fixed and determined as set up in paragraphs four and five of this agreement. If said Nelson should die or become so disabled by injury or sickness as to become incapable of managing and operating the business, then said Sullivan shall have the immediate and exclusive right to purchase the stock owned by Nelson or by his heirs, administrators or executors in accordance with the terms of this contract. Title so (sic) said shares of stock shall automatically rest in Sullivan upon Nelson's death and said Sullivan shall be obligated to Nelson's personal representative or representatives for the value thereof as fixed by this agreement."

According to the minutes of the corporation, on September 10, 1948, a special meeting of the Board of Directors of the corporation was held in Blytheville, Arkansas. At that meeting the following resolution was adopted (Plaintiffs' Ex. 3):

" 'WHEREAS William J. Sullivan, president of this corporation and Frank Nelson, both of whom are directors of this corporation have this 10th day of September, 1948 entered into an agreement covering the terms of the issuance by this corporation to said Frank Nelson of thirty-three (33) shares of stock in this corporation, and

"WHEREAS it is deemed by the board of directors of this corporation to be to the best interests of the corporation to issue such stock to said Frank Nelson subject to the terms and conditions of the aforesaid agreement,

"NOW THEREFORE, BE IT RE-SOLVED that the memorandum agreement entered into by and between said William J. Sullivan and Frank Nelson be and its terms are hereby ratified and adopted by this corporation, and

"BE IT FURTHER RESOLVED that a copy of this agreement herein described be attached to these minutes and marked 'Exhibit A'."

The approval of the minutes of this meeting was signed by plaintiffs and Nelson. Notice of this agreement was typed on certificates of shares of stock in the corporation issued to Nelson in 1948 and early 1949.

Plaintiffs offered the oral testimony of the witness Nelson contained in his deposition taken March 10, 1964; the oral testimony of the plaintiff Sullivan concerning the negotiations and events leading up to the execution of the memorandum agreement of September 1948; and the oral testimony of Samuel L. Trusty, Esquire, a member of the Kansas City Bar and formerly a member of the firm Trusty and Pugh, which was counsel for the plaintiff Sullivan in 1948. (Mr. Pugh was not living at the time of the hearing.) These witnesses testified concerning the events of 1948. Plaintiffs also offered the oral testimony of J. D. Widner, general manager of the corporation since 1956, and of Merle Clements, certified public accountant and attorney of Memphis, Tennessee, who advised Sullivan and Nelson in 1956 concerning the purchase of Nelson's stock in the corporation in that year.

This oral evidence was offered to prove that the plaintiff Sullivan and Nelson intended and orally agreed that Sullivan would not be personally obligated to redeem Nelson's stock; and that this oral agreement was reduced to writing in the memorandum agreement by Trusty and Pugh as attorneys for the plaintiff Sullivan.

Plaintiffs then claim that, when construed in the light of the extrinsic oral and documentary evidence, including the above quoted corporate minutes of September 10, 1948, the written memorandum agreement obligated the corporation to buy Nelson's stock, and did not obligate the plaintiff Sullivan to buy Nelson's stock. In plaintiffs' brief the evidence is summarized and the plaintiffs' contentions submitted in the following language:

"In February of 1941, when Eich acquired the 10 shares of stock and became an officer and director of the Corporation and its resident manager, his relationship with the Corporation and Sullivan was governed only by an oral agreement. Thereafter, on March 17, 1946, this Agreement was reduced to writing by execution of a Memorandum of Agreement by and between Sullivan and Eich. (Tr. 19, 20) Under the aforesaid Agreement, Sullivan was obligated to purchase Eich's stock in the Corporation in the event Eich's employment was terminated. (Tr. 22)

"On February 21, 1948, because of disagreement between Eich and Sullivan, Eich resigned from the Corporation and sold Sullivan all of his stock therein. (Tr. 21, 22, 28; P. Ex. 2) At this time, Eich and his wife owned 120 shares of stock of the Corporation. (Tr. 23) Sullivan paid Eich $570.00 per share for the 120 shares of stock, the consideration being paid from Sullivan's own funds. (Tr. 23, 24) At this time, February 21, 1948, upon the purchase of Eich's stock, Sullivan and his wife owned all of the issued and outstanding stock of the Corporation. (Tr. 38, 39; Stip. par. 16)

"Sullivan first became acquainted with Frank Nelson, hereinafter sometimes referred to as Nelson in about 1932. (Tr. 24) Nelson acquired considerable experience in the automobile dealership field and related activities, during the period 1926 through June, 1944. (Dep. pp 7–10) On June 1, 1944, Nelson

was employed by the Bill Sullivan Chevrolet Company, Kansas City, Missouri, as general manager. (Dep. p. 9) Nelson is related in no way to Sullivan or his wife. (Dep. p. 5)

"Nelson remained in Kansas City as general manager of the Bill Sullivan Chevrolet Company until February of 1948. (Dep. p. 11) On February 18, 1948, Sullivan asked Nelson if he would like to become the Chevrolet dealer in Blytheville, Arkansas. Nelson indicated that he would be interested in the proposition, the two men departed for Memphis, Tennessee that same evening, and arrived in Blytheville, Arkansas a day or so later. (Dep. p. 16; Tr. 25) On the trip to Blytheville, Sullivan and Nelson discussed the terms of Nelson's employment by the Corporation and the arrangement whereby Nelson would be permitted to purchase stock of the Corporation. (Dep. p. 17; Tr. 31) Sullivan and Nelson agreed that Nelson would receive a salary of $12,500.00 per year, plus 10 percent of the net profit before taxes, and 10 percent of the commissions on insurance. (Dep. p. 18) Nelson agreed to sell his house in Kansas City and purchase as many shares of stock in the Corporation as the sale's proceeds would permit. The cost of the initial block of stock to be purchased was to be based on the book value of the stock as of February 28, 1948, which was $570.-00 per share. (Dep. pp. 17, 18) Sullivan and Nelson further agreed that Nelson would be permitted to purchase a maximum of 40 percent of the issued and outstanding stock of the Corporation. (Dep. 19) *Sullivan and Nelson also agreed that the Corporation, not Sullivan, would be obligated to buy Nelson's stock.* (Tr. 115)

"Special meetings of the directors and stockholders of the Corporation were held on February 21, 1948, at which time Eich resigned from the Board of Directors, Nelson was elected to the Board of Directors and one share of stock, a qualifying share, was issued to Nelson. (Dep. p. 20; P. Ex. 1, 2; Tr. 28–30) Thereafter, until May, 1956, Nelson continued as a stockholder, director, and officer of the Corporation and its resident manager, in Blytheville, Arkansas. (Dep. p. 22)

"*In September, 1948, the oral agreement which had heretofore governed the relationship of Sullivan, Nelson and the Corporation, was reduced to writing and incorporated in Plaintiff's Exhibit 4, entitled 'Memorandum Agreement',* hereinafter sometimes referred to as the 'Memorandum Agreement'. (Dep. p. 25; Tr. 31; p. Ex. 4) Because of the necessity of selling his house, moving his family, and obtaining approval from the Chevrolet Motor Company for the sale of Sullivan's stock to Nelson, it was not possible to consummate the Memorandum Agreement prior to September, 1948. (Dep. pp. 26–27) Early in September, 1948, Sullivan contacted his attorneys, Sam Trusty and Ed Pugh, in Kansas City, Missouri, and gave them instructions respecting the drafting of the Memorandud (sic) Agreement. (Tr. 33–34, 131)

"Trusty and Pugh were familiar with the Loy Eich situation since they had prepared the contract between Eich and Sullivan, and Sullivan instructed Trusty and Pugh that he did not want the same situation (wherein he would be personally obligated to redeem Nelson's stock) to develop again. Sullivan instructed Trusty and Pugh to draft an agreement which would not obligate him to purchase Nelson's stock if it were ever offered for sale. (Tr. 33, 34, 37, 130, 132, 133) Trusty and Pugh prepared the Memorandum Agreement, advised Sullivan to go to Blytheville, Arkansas, discuss the Memorandum Agreement with Nel-

son, and hold a meeting of the Board of Directors of the Corporation, at which time the directors should ratify and adopt the Memorandum Agreement. (Tr. 35, 36, 133) Trusty and Pugh also advised Sullivan to have Nelson sign the Memorandum Agreement but not to sign it himself. (Tr. 36, 134, 135) The Memorandum Agreement was prepared sometime early in September of 1948 and taken by Sullivan to Blytheville, Arkansas, where Sullivan arrived on September 10, 1948. Sullivan and Nelson discussed the Memorandum Agreement and held the meeting of the Board of Directors at which a resolution was passed, the material part of which is quoted below:

 " 'The president announced that the purpose of the meeting was to authorize the terms under which additional shares of stock in the corporation were to be issued to Frank Nelson. He offered for the consideration of the board a memorandum agreement made on this date between William J. Sullivan of Kansas City, Missouri and Frank Nelson of Blytheville, Arkansas, which agreement was read and examined by the board of directors. Thereupon on motion duly made and seconded the following resolution was unanimously adopted: [Here the above quoted resolution (Plaintiffs' Ex. 3) is set forth.]'

"Nelson signed the Memorandum Agreement in Blytheville, Arkansas, on September 10, 1948, and Sullivan returned to Kansas City with the Agreement. (Tr. 36; P. Ex. 3) Sullivan again met with Trusty and Pugh and related to them the events which had taken place at the Directors' meeting. Whereupon, Trusty prepared the resolution of the Board of Directors and the language thereof was read over the telephone to Nelson, who had remained in Blytheville. (Tr. 135) The Directors'

resolution adopted at the meeting of September 10, 1948, was then executed. (Tr. 36, 38; P. Ex. 3; Tr. 135) Thereafter on September 14, 1948, Sullivan signed the Memorandum Agreement. (Tr. 36, 38, 134, 135; P. Ex. 4)

"Sullivan's attorney, Mr. Trusty, advised Sullivan that the Corporation's ratification and adoption of the Memorandum Agreement would result in the Corporation being obligated to purchase Nelson's stock; but that under the Memorandum Agreement Sullivan would be obligated to sell to Nelson 40 percent of the issued and outstanding stock of the Corporation. (Tr. 133, 134)

"Nelson advised Sullivan that he wanted the Corporation obligated to buy his stock anytime he desired to sell it. (Tr. 42, 133; Dep. 29, 30) Nelson insisted on the Corporation being obligated to repurchase his stock because of the possibility that Sullivan might die and because he wanted the Corporation by which he was employed and in which he would invest his money to be responsible. (Dep. p. 29; Tr. 41, 133) Nelson understood that under the Memorandum Agreement of September 10, 1948, he had the right to buy shares of stock in the Corporation from Sullivan and his wife, only, and that he had no right to buy shares of stock from the Corporation. (Dep. 61, 62; Tr. 134) Nelson did not desire to buy stock from the Corporation because he believed the purchase of unissued shares of stock would dilute his holdings. (Dep. 62) Nelson understood that under the Memorandum Agreement, if he were discharged the Corporation would have to buy his stock, that Sullivan alone could not purchase his stock, and that if Nelson died, the corporation would purchase the stock from his widow. (Dep. 59, 61)

"The controlling and material provisions of the Memorandum Agreement of September 10, 1948, exe-

cuted by and between Sullivan and Nelson, which was adopted by the Corporation, are as follows: " [Here follows the written agreement dated September 10, 1948, between Sullivan and Nelson, the pertinent portions of which are quoted above.] (Emphasis added.)

The oral evidence supports the factual contentions set forth except to the extent that it is not consistent with the unambiguous provisions of the written memorandum agreement dated September 10, 1948. The legal effect of this oral evidence will be discussed hereinafter.

Late in 1955, approximately seven years after the execution of the memorandum agreement, Nelson advised Sullivan that Nelson desired to acquire an automobile dealership of his own because Nelson wanted to own 100 percent of a dealership. Nelson could not acquire 100 percent of the stock of the corporation because he was limited by the memorandum agreement to acquisition of no more than 40 percent of the stock of the corporation.

In early 1956, Nelson negotiated the purchase of a Chevrolet dealership at Poplar Bluff, Missouri, and made a down payment thereon in the sum of $5,000.

Thereafter, in April 1956, the corporation purchased (or redeemed) the 114 shares held by Nelson at the book value as of March 31, 1956. The determination of the book value, the preparation of the papers, including the minutes of the corporate meetings, consummating the transaction, were directed by the witness Merle Clements, a partner in the firm of George B. Jones and Company, Certified Public Accountants, of Memphis, Tennessee.

At the time that the corporation redeemed Nelson's stock in 1956, a number of documents were prepared, none of which could have the effect of altering the basic obligations expressly and clearly provided by the written agreement between the plaintiff Sullivan and Nelson and by the action of the corporation in 1948.

Some of these 1956 documents are consistent with the claims which the plaintiffs now make that plaintiff Sullivan did not in 1948 incur an unconditional obligation to purchase Nelson's stock. For example, the corporate minutes of March 9, 1956, (Plaintiffs' Ex. 5) contain approval of a resolution which described the memorandum agreement as granting to Sullivan an option to purchase the shares of stock of Nelson. Furthermore, in his deposition given after this suit was instituted, Nelson testified in support of plaintiffs' claim that the corporation rather than the plaintiff Sullivan was to be obligated to buy Nelson's stock and that the plaintiff Sullivan had no obligation whatsoever. See pages 31 and 32 of Nelson's deposition of March 10, 1964. The closing documents consistent with plaintiffs' claim were prepared in 1956 by the tax consultant and attorney employed to consummate the purchase (or redemption) transaction. It is interesting to note in connection with Nelson's deposition testimony that Nelson took the opposite position in a letter dated March 30, 1956, addressed to the plaintiff Sullivan which reads as follows:

"Dear Bill:

"As I have previously discussed with you, it is my desire to divest myself completely of the ownership of all shares of stock I now hold in the Sullivan-Nelson Chevrolet Company.

"Under the terms of the Memorandum Agreement between us dated September 10, 1948, I must offer these shares for sale to you and you must accept my offer and purchase them at 'book value' as determined in the Agreement.

"I have by a letter dated March 9, 1956, advised the Chevrolet Division of General Motors Corporation of my position in this matter and I await your usual prompt reply."

This letter is obviously inconsistent with Nelson's deposition testimony. Plaintiffs contend that this letter was written by the tax consultant in April 1956 and

antedated. The tax consultant so testified (Tr. 170–73). This letter is not decisive and no finding of fact or of failure of proof is based thereon in respect to the construction of the 1948 memorandum agreement.

The evidence shows that Sullivan accepted an oral offer by Nelson to sell his stock, confirmed in the above-quoted letter of March 30, 1956, from Nelson to Sullivan. This offer was also confirmed and accepted by an undated letter from Sullivan to Nelson directing Nelson to transfer the capital stock to the corporation at the book value. This letter expressly contemplated transfer to the corporation. It reads as follows:

"Dear Mr. Nelson:

"Since ypu (sic) have notified me of your intention of terminating your employment by Sullivan-Nelson Chevrolet Company, and under the terms of our memorandum agreement dated September 10, 1948, you have offered for sale to me, ii4 (sic) shares of the capital stock of Sullivan-Nelson Chevrolet Company at the book value as determined from an adjusted monthly financial statement as of the close of business of the last day of the month preceding your resignation; I invoke the terms of paragraph 6 of said agreement and hereby authorize and direct you to transfer your entire holdings of the capital stock of Sullivan-Nelson Chevrolet Company to said corporation at the book value as aforesaid. * * * "

The purchase (or redemption) of Nelson's stock was consummated out of accumulated earnings of the corporation which were available for declaration of dividends, as shown by the condensed balance sheets of the corporation as of March 31, 1956, and as of April 1, 1956. These balance sheets reflect the changes in the corporate books resulting from the purchase of the Nelson stock. Before the purchase of the Nelson stock the corporation owned a surplus above the original capital stock liability of $491,932.22, designated as "retained earnings".

## CONCLUSIONS OF LAW

The decisive legal question in this case is whether the plaintiff Sullivan was primarily obligated to purchase the stock of Nelson, when Nelson decided in 1956 to terminate his employment as resident manager of the corporation and to purchase the Chevrolet dealership in Poplar Bluff, Missouri. The determination of this question depends upon the legal effect of the negotiations and agreements beginning in February 1948 and culminating in the execution of the written memorandum agreement by the plaintiff Sullivan in Kansas City, Missouri, on September 14, 1948. Since there is no evidence or contention that the memorandum agreement was revoked, modified, or supplemented by any subsequent agreement, the obligation, if any, of the plaintiff Sullivan to purchase Nelson's stock must be determined by the events and writings of 1948, and the events of the period from 1948 to 1956.

If the plaintiff Sullivan was unconditionally and primarily obligated to purchase Nelson's stock in 1956 and if the stock was purchased by the corporation out of profits distributable as a dividend, the plaintiff in 1956 constructively received income equivalent to a dividend in the amount of $198,334.58. This conclusion is required by the holdings of the following controlling decisions and authorities: Holsey v. Commissioner of Internal Revenue (C.A.3) 258 F.2d 865; Wall v. United States (C.A.4) 164 F.2d 462; Woodworth v. Commissioner of Internal Revenue (C.A.6) 218 F.2d 719; 1 Mertens, Federal Taxation § 9.08, p. 20 (Zimet ed.); Harnett, Buying Out the Disputatious Shareholder, 11 N.Y.U. Institute on Federal Taxation 393. Compare Idol v. Commissioner of Internal Revenue (C.A.8) 319 F.2d 647; Zipp v. Commissioner of Internal Revenue (C.A. 6) 259 F.2d 119.

On the other hand, if the plaintiff Sullivan had no primary obligation to buy Nelson's stock in 1956, or if the plaintiff Sullivan had the right to buy Nelson's stock in 1956 but was not obligated to do so, there was no constructive dividend

and plaintiff would be entitled to recover in this suit. Holsey v. Commissioner of Internal Revenue, supra; S. K. Ames, Inc., 46 B.T.A. 1020; Princess Coals, Inc. v. United States (S.D.W.Va.) 239 F.Supp. 401; 1 Mertens, Federal Taxation § 9.08, p. 20 (Zimet ed.); Harnett, Buying Out the Disputatious Shareholder, supra.

■ Further, there is no constructive dividend where the taxpayer's obligation in respect to the corporate stock is to "purchase or cause to be purchased". S. K. Ames, Inc., supra.

■ Moreover, in other words, there is no constructive dividend when the taxpayer has an option to purchase the corporate stock but is not required to do so. Holsey v. Commissioner of Internal Revenue, supra. Acquiescence noted: Rev. Rul. 614, 1958–2 Cum.Bull. 920; Princess Coals, Inc. v. United States, supra.

■ Similarly, where the obligation of the taxpayer is either to purchase the corporate stock or vote the taxpayer's stock for liquidation of the corporation, there is no constructive dividend. Rev. Rul. 286, 1959–2 Cum.Bull. 103.

The taxpayers assert that the payment by the corporation must be in "payment of a taxpayer's indebtedness" but not merely "in satisfaction of a contractual obligation" to constitute the equivalent of a dividend to the taxpayer. No authority has been found which will support this not wholly clear contention.

Taxpayers also argue that there is no constructive dividend if the taxpayers' obligation to purchase was "executory". If by this argument it is implied that there is no constructive dividend in the case of an unconditional obligation by the taxpayers to purchase the stock, there is no authority to support the proposition. If by this argument it is meant that there is no constructive dividend when the taxpayer has not incurred an unconditional primary obligation to purchase, the argument is consistent with the conclusions of law above set forth in this opinion. If by this argument it is meant

that the obligation was "executory" until Nelson offered to sell, Nelson did offer to sell in 1956 making the obligation of Sullivan to buy an unconditional obligation.

The taxpayers have other principal contentions remaining. The first is that the oral and documentary evidence, extrinsic of the memorandum agreement, when considered with the memorandum agreement, established by a preponderance of the evidence, or as a matter of law, that the plaintiff Sullivan did not unconditionally obligate himself to purchase Nelson's stock; that at most Sullivan reserved an option to purchase Nelson's stock or the option to select another buyer for Nelson's stock.

The second contention of plaintiffs is that the evidence establishes that "the corporation and not Sullivan was obligated to redeem Nelson's stock".

In connection with these contentions, the Government has objected to the consideration of parol evidence in the construction of the taxpayers' agreement in 1948, invoking the parol evidence rule. Against this objection, the taxpayers contend the parol evidence rule is not applicable because (1) the memorandum agreement of 1948 is ambiguous and that, in any event (2) the Government has no standing to invoke the parol evidence rule, since it is a stranger to the agreement. The soundness of these latter two contentions will be settled first.

■ It is first concluded that the memorandum agreement executed by the plaintiff Sullivan on September 14, 1948, is clear and unambiguous. Therefore the manifest obligations provided thereby are not affected by parol evidence of subjective intentions, inconsistent discussions, oral understandings, and negotiations leading up to its execution. In this connection, it is concluded that, in essence, the parol evidence rule as applied here is a rule of substantive law determining the legal obligations of the parties to the memorandum agreement in the light of prior oral negotiations and in-

tentions not reflected in the unambiguous written contract.

■ It is immaterial that the litigation in which the parol evidence rule is invoked is between a party to the writing and a stranger thereto. Clark v. United States (C.A.9) 341 F.2d 691.[1] The true test in this case is whether the plaintiff Sullivan was unconditionally and primarily obligated by virtue of the 1948 memorandum agreement to purchase Nelson's stock upon the termination of Nelson's employment as resident manager in 1956 and upon his offer to sell to Sullivan. This obligation for tax purposes is not dependent upon whether Nelson is a party to the action in which the question is decided. If in 1956 Nelson could have maintained an action against Sullivan for breach of unconditional primary obligation to purchase Nelson's stock upon termination of Nelson's employment, there was an absolute, unconditional primary obligation on the part of Sullivan to purchase Nelson's stock for income tax purposes.

The taxpayers cite in support of their claim that the parol evidence rule cannot be invoked by the Government, a stranger to the contract, the following cases: Stern v. Commissioner of Internal Revenue (C.A.2) 137 F.2d 43, 46; Brassert v. Clark (C.A.2) 162 F.2d 967, 973; Scofield v. Greer (C.A.5) 185 F.2d 551, 552; Scott v. Gearner (C.A.5) 197 F.2d 93, 96; Gibson v. United States, 106 U.S.App.D.C. 10, 268 F.2d 586, 599; Cooper Foundation v. O'Malley (D.Neb.) 121 F.Supp. 438, 444.

None of these cases is in point here[2] The parol evidence here has been ad-

1. Much of the confusion about the doctrine of integration in respect to contracts is caused by the use of the deceptive title "Parol Evidence Rule" to describe the doctrine. The doctrine is not a rule of evidence; it is a rule of substantive law. The doctrine is applicable not only to oral (parol) evidence but applies to writings as well. The discussion in many cases whether the "Parol Evidence Rule" is binding only upon the parties to the document is a false issue which has led to much confusion. See 9 Wigmore, Evidence (3d ed.) § 2446, pp. 149–151. Generally on the nature of the "Parol Evidence Rule" as a rule of substantive law, see the following: Restatement, Contracts, §§ 237–244, in particular § 237, Comment a.; 9 Wigmore, Evidence (3d ed.) §§ 2425–2426, 2429–2453 on integration of bilateral acts; 3 Corbin, Contracts (1951 ed.) §§ 573–596 (in particular § 573 on nature of rule and § 596 on application for or against one not a party to the agreement); McCormick, Evidence (1954) § 213.

2. The Stern case, supra, is not in point. It involved the identity of the source of the *corpus* of a trust created for a wife in settlement of her claims under a separation agreement and suits for alienation and criminal conversation. While the term "parol evidence rule" is loosely used, the issue was whether the *corpus* of the trust was, in fact, derived from the husband's funds or income so that income from the trust should be treated as earnings of the husband. The Brassert case, supra, does not support the plaintiffs' theory of application of the parol evidence rule in any way. It was a suit to determine whether a transfer of patents to an American citizen was a subterfuge, or truly irrevocable so as to be immune from seizure under Section 9(a) of the Trading with the Enemy Act. There, Judge L. Hand properly reviewed all the evidence and found that the transfer was intended to be and was irrevocable. He determined the issue as a matter of substantive law after reviewing the whole of the transaction, saying, at pages 973 and 974 of 162 F.2d:

"Why then should not all the documents which expressed the actual intent be read together? As between the principal and the agents, the power of attorney may have been an 'integrated memorial' of their agreement; we will assume that the parol evidence rule applied to it. However, that rule does not prevent the entire intent of the parties from appearing—so far as it has been actually expressed—when that intent becomes relevant in a transaction between either party and a third party.[5] (5. Indianapolis Glove Co. v. United States, 7 Cir., 96 F.2d 816, 819; Patterson v. Texas Co., 5 Cir., 131 F.2d 998, 1001; Stern v. Commissioner [of Internal Revenue], 2 Cir., 137 F.2d 43, 46; White v. Union Producing Co., 5 Cir., 140 F.2d 176, 179; Wigmore, § 2446.)"

In the Brassert case the issue was whether the transaction was a subterfuge and

mitted, considered, and found as a matter of law not to affect substantive contractual rights of Sullivan and Nelson under the memorandum agreement. As applied in this case, the parol evidence rule is a rule of substantive law not an evidentiary privilege of the parties. 3 Corbin, Contracts § 573, pp. 356–369; 9 Wigmore, Evidence §§ 2400–2446, pp. 3–149 (3d ed.).

The next question to be decided is the crucial question whether plaintiff Sullivan had an unconditional primary obligation to purchase Nelson's stock when Nelson terminated his employment in 1956. It is concluded that Sullivan did have such an obligation. In the first place, the contract must be construed in the light of Nelson's and Sullivan's objective manifest intentions rather than their subjective intentions or interpretations. This is the general rule in contract cases. Restatement, Contracts §§ 2 and 70, pp. 25 and 73 (1932). (The exceptions to the general rule are not material. Sections 55, 71, and 72). Therefore, only the writings, the negotiations, and the circumstances known to Nelson and Sullivan can be considered in construing the contract. The private discussions between Sullivan and his attorneys, not known to Nelson when the contract was made, are immaterial.

Paragraph 6 of the written memorandum agreement contains an unconditional primary obligation on the part of Sullivan to buy. This paragraph is as follows:

"6. TRANSFER OF SHARES OF STOCK. It is understood and agreed that Sullivan is permitting Nelson to buy stock in said corporation for the purpose of giving him a working interest only, and said Nelson agrees that said shares of stock cannot and will not be mortgaged, hypothecated or transferred by him, his heirs, executor, administrator or trustee to any person other than William J. Sullivan or such person as said Sullivan directs in writing. Any such sale, delivery or transfer to any other person, firm or corporation shall be null and void. *Said Sullivan agrees that he will, within thirty (30) days after such shares have been offered for sale to him, accept the offer to sell, provided always that such shares shall be offered for sale at a price to be determined according to this contract.*" (Emphasis added.)

therefore a fraud. Therefore it is not in point.

The Scofield case, supra, states that the parol evidence rule is not applicable in a tax refund suit because the Government was not a party or privy to the written agreement concerned. While the case does not recognize the modern view of the parol evidence rule, it reached a correct result and is not inconsistent with the ruling in the case at bar.

In the Scott case, supra, the Court recognized the true nature of the doctrine as a rule of substantive law by relying on 9 Wigmore, Evidence (3d ed.) § 2446, which states at page 150:

"The truth seems to be, then, that the rule will still apply to exclude extrinsic utterances, even as against other parties, provided it is sought to use those utterances *for the very purpose for which the writing has superseded them as the legal act.*" (Emphasis Wigmore's.)

The Gibson case, supra, was a criminal case in which Wigmore and Corbin are cited and relied upon, along with the statements of law repudiated by Corbin and Wigmore. While loose language supporting plaintiffs' conception of the rule is used, the case reaches a correct result. In the Cooper case, supra, the challenged evidence was received in a tax refund suit over the objection of the Government. This ruling relied on a loose statement of the parol evidence rule from 32 C.J.S. Evidence § 861, p. 791, (now 32A C.J.S. Evidence § 861, p. 224). This type of ruling is accurately described in 9 Wigmore, Evidence (3d ed.) § 2446, p. 149, as follows:

"It is commonly said that the Parol Evidence rule, in the present aspect, is *binding upon only those persons who are parties to the document.* This form of statement suffices in most instances to reach correct results; but it is not sound on principle." (Emphasis Wigmore's.)

Plaintiffs contend that the first two sentences of Paragraph 6 of the memorandum agreement clearly provide that Sullivan is not unconditionally obligated to purchase Nelson's stock. In the alternative, plaintiffs contend that, if these two sentences do not clearly provide that Sullivan may, at his option, cause the stock to be purchased by a stranger to the contract, an ambiguity and uncertainty in Sullivan's obligation are created thereby, rendering the parol evidence of intention applicable and decisive in favor of the plaintiffs.

Harmonious and consistent construction of all the provisions of the memorandum agreement and contemporaneous documents can be and should be made. The obligation to purchase is not inconsistent with, or rendered ambiguous or unclear by, a restrictive covenant on the part of the seller to transfer only to the buyer or some person designated in writing by the buyer. Therefore, the first two sentences of Paragraph 6 of the memorandum agreement do not create an option to purchase (as in the Holsey case) or an alternative obligation to purchase or cause to be purchased (as in the Ames case). At most, Sullivan had an option to designate the transferee of Nelson's stock when purchased by Sullivan.

Upon the termination of his employment or relationship with Sullivan as provided in Paragraph 7 of the memorandum agreement dated September 10, 1948, Nelson was obligated to sell, transfer, and deliver to Sullivan all his shares of stock. The pertinent portion of Paragraph 7 is as follows:

"Said Nelson agrees that if he should terminate his employment or relationship with William J. Sullivan or employment by the said corporation, and if his connection and association with the corporation should cease or be terminated by Sullivan or the majority owners of the stock of the corporation, *then said Nelson agrees to sell and transfer and deliver to Sullivan at the* *then book value all shares of stock owned by him in the Sullivan-Nelson Chevrolet Co. \* \* \*"* (Emphasis added.)

The sale price was fixed with sufficient definiteness to constitute an enforceable obligation by Paragraph 5 of the memorandum agreement, which is as follows:

"5. HOW VALUE OF STOCK AND PRICE AS TO PURCHASE AND SALE IS DETERMINED. The price of a share of stock in the corporation when purchased or sold by Nelson shall be determined from an adjusted monthly financial statement as of the close of business as of the last day of the preceding month. Such statement shall be used by the parties including their heirs, executors and administrators in determing (sic) the book value of the stock as defined in paragraph four above."

The obligation of Sullivan to purchase became fixed upon Nelson's termination of his employment as manager of the corporation and offer of the stock for sale to Sullivan, which offer was made.

These provisions of the memorandum agreement are clear, unambiguous, and definite. They were not affected by the parol evidence as a matter of substantive law.

*The Effect on the Obligation of the Parties of the Adoption of the Corporate Resolution Dated September 10, 1948*

The resolution contained in the corporate minutes of September 10, 1948, has been quoted above. Since the memorandum agreement and the resolution were contemporaneously executed by Nelson and adopted by Nelson and Sullivan as directors of the corporation, they should be construed together. If the resolution and the memorandum agreement are clear, unambiguous, and consistent, there is no occasion to consider parol evidence to interpret or construe the terms of either.

It is concluded that they are both clear, unambiguous, and consistent. The resolution implements the memorandum agreement by providing that the stock sold to Nelson be issued subject to the terms and conditions of the memorandum agreement restricting Nelson's right of sale. As a result of the adoption of this resolution, reference was made on the face of the stock certificates issued to Nelson in 1948 and early 1949 to the fact that the stock was not transferable except in accordance with the terms of the memorandum agreement of September 10, 1948. It is a common practice (often required by law to make the restrictions effective) to give notice of the restrictions on transfer to prospective purchasers of corporate stock.

Furthermore, the ratification of Sullivan's agreement to purchase did not relieve him of the obligation to purchase Nelson's stock, or of the tax in question. In Woodworth v. Commissioner of Internal Revenue (C.A.6) 218 F.2d 719, the ratification by corporate resolution was considered and held not to relieve the taxpayers of obligation in an analogous situation.

Therefore the extrinsic parol and documentary evidence offered by the plaintiff has been received in evidence and considered as to its effect. Since this was a trial without a jury, the usual rulings on objections to evidence were not made when the evidence was offered.

Plaintiffs next contend that the result reached in this case is one which exalts form over substance. In the case of clear, unambiguous, valid contracts, the substantive rights of the parties are fixed by the clear meaning of the language used. In this highly technical field of federal income taxation, the clear wording of written contracts (form of transactions) fixing substantive rights must be given effect unless the wording used (form) is a sham or subterfuge or fraud. In this case the wording is none of these. Sometimes the wording used protects against tax liability, as in Stout v. Commissioner of Internal Revenue (C.A.4) 273 F.2d 345, wherein it is stated at page 352:

"* * * If another transaction by which the parties might have come to substantially the same end would have resulted in tax liabilities because of the form in which it was cast, there is no reason to hold taxable a transaction cast in nontaxable form when the substantive bases of taxation are absent."

At other times the language in which a transaction is cast creates a tax liability which would not have existed if a different form had been used, as in this case. But in cases such as this, the form of the transaction creates and gives rise to the substantive rights and obligations involved on which taxability or nontaxability is decided.

The fact that the redemption of Nelson's stock by the corporation could have been accomplished with tax consequences more favorable to the plaintiffs if a different agreement had been reached in 1948, does not alter the plaintiffs' tax liability. On this question the following language from Woodworth v. Commissioner of Internal Revenue (C.A.6) 218 F.2d 719, l. c. 724, is in point:

"It is true that the syndicate members could have achieved their objective, yet completely avoided the tax liability here imposed, simply by their purchase of the two hundred shares owned by the minority shareholders, followed by Buckeye's redemption of all Mrs. Derby's stock. We can assume that if the transaction had been cast in that form neither petitioners nor Mrs. Derby would have been charged with the receipt of ordinary income. Cf. Zenz v. Quinlivan, 6 Cir., 1954, 213 F.2d 914.

"That being so, it can be argued that to permit the decision of the Tax Court to stand is to permit form to triumph over substance. Yet, to the extent here implied, it is form which often must prevail, when the delicate question involved is whether

the extraction of a corporation's earned surplus has been accomplished at less than the rates taxed upon ordinary income. Cf. Chamberlin v. Commissioner [of Internal Revenue], 6 Cir., 1953, 207 F.2d 462. 'If a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed.' Woodruff v. Commissioner [of Internal Revenue], 5 Cir., 1942, 131 F.2d 429, 430. Indeed the statute directs that the 'manner' of the transaction be a controlling factor."

 The evidence extrinsic of the written agreement and corporate minutes might have the effect of establishing that the corporation was secondarily liable as a guarantor or indemnitor of Sullivan's obligation to purchase Nelson's stock. But this would not alter Sullivan's tax liability if Sullivan was, as found herein to be, unconditionally and primarily obligated to purchase Nelson's stock. Compare Lowenthal v. Commissioner of Internal Revenue (C.A.7) 169 F.2d 694; Sachs v. Commissioner of Internal Revenue (C.A.8) 277 F.2d 879.

In reaching the conclusions stated herein, full credit has been given to the testimony of the distinguished lawyer Samuel L. Trusty, Esquire, as a sincere and credible recollection of events which transpired nearly twenty years ago.

## DISCUSSION OF POST-DECISIONAL ARGUMENTS OF PLAINTIFFS

Until the time that the decision in this case was formally announced, both parties agreed that the only issue in the case was whether "the corporation's redemption of Nelson's stock satisfied or relieved Sullivan of an obligation to do so." Since the decision was announced and before the completion of this Memorandum, plaintiffs' counsel have, without leave of Court, filed numerous letter briefs attempting to inject new issues in this case

and new theories of non-liability of the plaintiffs for the taxes in issue. In plaintiffs' trial brief filed in this cause the day before the hearing of evidence and affirmed at the opening of the evidentiary hearing (Tr. 3), the plaintiffs' position in this case was stated as follows:

"QUESTION PRESENTED

"Whether the payment by the Sullivan-Nelson Chevrolet Company (now named Kaw Finance Company), an Arkansas corporation, of $198,334.58 on or about May 1, 1956, to Frank W. Nelson, in redemption of all of his stock in that corporation (a total of 114 shares of common capital stock), was essentially equivalent to the distribution of a taxable dividend to William J. Sullivan, a remaining stockholder of the corporation."

After stating their version of the facts in their trial brief, plaintiffs defined the critical issue in the case in the following language:

"Upon the foregoing facts the District Director, through his agent, has concluded that the corporation's redemption of Nelson's stock, by payment of the amount of $198,-334.58 to Nelson, constituted the equivalent of a dividend from the corporation to Sullivan. The rationale of the Government's case is that the corporation, by the redemption, satisfied a personal obligation of Sullivan's to redeem Nelson's stock; so that the amount paid by the corporation to Nelson constituted a constructive dividend to Sullivan. To support this conclusion the Government relies upon the principle that 'payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer * * *.' Wall v. U. S., 164 F.2d 462, 464 (CA 4th 1947). See generally Mertens (Zimet Ed.), Vol. I, Sec. 9.08, page 20. With this principle the plaintiffs have no quarrel. The question pre-

sented is whether the facts of this case invoke that principle. Generally, of course, the question of whether a corporate distribution was essentially equivalent to a taxable dividend is a question of fact and raises no question of law susceptible of review. United States v. Carey, 289 F.2d 531, 537 (CA 8th 1961); Ferro v. Commissioner [of Internal Revenue], 242 F.2d 838, 840 (CA 3rd 1957); Keefe v. Cote, 213 F.2d 651, 656 (CA 1st 1954); Woodworth v. Commissioner [of Internal Revenue], 218 F.2d 719, 727 (CA 6th, 1955); Randolph v. Commissioner [of Internal Revenue], (CA 8th) 76 F.2d 472, 476, cert. den.; Helvering v. Randolph, 296 U.S. 599 [56 S.Ct. 116, 80 L.Ed. 425] (1935). More specifically, the precise factual question presented is whether the corporation's redemption of Nelson's stock satisfied or relieved Sullivan of an obligation to do so. Resolution of this question turns on the issue of whether the corporation or Sullivan was obligated to redeem Nelson's stock. The evidence herein will establish that Sullivan was never obligated to redeem Nelson's stock; but, conversely, the corporation, from the beginning, was so obligated."

Now that what was once agreed to be the critical issue in the case has been decided in favor of the defendant, the plaintiffs have undertaken to inject numerous issues and theories into this case, and also to reargue the principal issue in different forms. These new arguments will be discussed briefly.

■ It is argued that the defendant, and therefore the Court in this decision, did not give appropriate weight to the question of whether a *bona fide* corporate business purpose existed, in accordance with the rulings in Idol v. Commissioner of Internal Revenue (C.A.8) 319 F.2d 647; United States v. Carey (C.A.8) 289 F.2d 531, l.c. 537; Heman v. Commissioner of Internal Revenue (C.A.8) 283

F.2d 227, l.c. 231; Princess Coals, Inc. v. United States (S.D.W.Va.) 239 F. Supp. 401, and similar cases. In this case, the only possible application of the business purpose doctrine would result from the presence of a business purpose rather than a tax avoidance purpose in causing the corporation to purchase Nelson's stock in 1956. There was no such business purpose. The only purpose apparent from this record (provided the original contract has been properly construed) was to minimize plaintiffs' income taxes by using accumulated corporate profits to discharge the primary liability of the plaintiff Sullivan without distributing the earnings as dividends to Sullivan. This is not a case where there was a novation or new arrangement resulting in a non-taxable transaction unless the novation or new arrangement were a fraud, sham, or a subterfuge. In such a case the business purpose doctrine might be decisive. Princess Coals, Inc. v. United States, supra. Full consideration and effect have been given to the business purpose doctrine in reaching the decision in this case.

■ Plaintiffs further argue that the cases of Idol v. Commissioner of Internal Revenue, supra, and Sachs v. Commissioner of Internal Revenue, supra, and similar cases, require an economic benefit to the plaintiffs in addition to the discharge of their obligation to purchase Nelson's stock. Full consideration has been given to this argument which is deemed to be unsound. In the Sachs case, the argument of lack of economic benefit accruing to the taxpayer was disposed of by the Court briefly with this statement: " * * * we need only observe that he personally was liable for payment of the fine assessed against him for his criminal act; that it was in the nature of any other private debt, and his property and assets were liable for seizure and sale in satisfaction of such debt." The economic benefit to the plaintiff Sullivan in this case was the discharge by the corporation, with the use of undistributed corporate earnings, of his private obligation to purchase Nelson's

stock. There is nothing in the Idol case or other cases cited by the plaintiff contrary to this conclusion. Full consideration and effect have been given to the economic benefit doctrine.

Plaintiffs claim further that the transaction in question should not be treated as a constructive dividend to the shareholder because of the provisions of Section 302 of the Internal Revenue Code quoted above read in connection with Section 346. In connection with this argument, plaintiffs rely upon United States v. Carey (C.A.8) 289 F.2d 531, asserting that the regulations under Section 302, namely Reg. Sec. 1.302–3(a) (3) is in conflict with the Carey case. It is not necessary in this case to determine the soundness of this claim of conflict with the Carey case and the regulations cited. In the Carey case there was no obligation on the part of the taxpayer to purchase the stock of another shareholder which was discharged by the corporation out of earnings, as appears in this case. This is a vital distinction between this case and the Carey case.

Furthermore, Section 302(a) and (b) cannot be held to exonerate the plaintiffs in this case from liability for a constructive dividend because that section applies only if the "redemption is not essentially equivalent to a dividend." Section 302(b) (1). The plaintiffs make the contention that Section 302 was intended to create a series of exceptions to the doctrine of the Holsey, Wall, Woodworth line of cases, supra, if the transaction meets the tests of any of paragraphs (2), (3), or (4) of Section 302 (b) as well as if it meets the tests of paragraph (1) discussed above. This argument leads plaintiffs into a discussion of Section 346 as well.

If Section 302, alone or with Section 346, were intended to permit satisfaction of the shareholders' liability out of earnings without treating the transaction as a constructive dividend, the statutes themselves and legislative history should make this clear, which they do not.

In the Carey case, the Court not only relied upon and reaffirmed the test of the Holsey case, but explicitly stated that the meaning of "essentially equivalent to a dividend", as interpreted by the Courts in cases arising under the 1939 Code, was retained. 289 F.2d at pages 536 and 537. The taxpayers seized upon the italicized portion of the following sentence from the Carey case as rendering the doctrine of the Holsey and similar cases inapplicable:

"It clearly appears from the Senate Report, supra, that Congress at the time it enacted the Internal Revenue Code of 1954 was familiar with the interpretation given the dividend-equivalent language by the courts, and it appears from the legislative history as a whole that Congress had no intention to change the meaning of 'essentially equivalent to dividend' as interpreted by the courts in cases arising under the 1939 Code, *in a situation such as here presented, where the facts do not fall within any of the specific new provisions* contained in §§ 302(b) or 346." (289 F.2d at 536, 537. Emphasis supplied.)

The fallacy of taxpayers' reasoning lies in the fact that the new provisions contained in Section 302(b) and Section 346 were never intended to apply to a situation such as this, where the corporation discharged a primary unconditional obligation of the taxpayer from its earnings. This seems to be a fair conclusion from the reading of the statute and the legislative history. Other arguments made by the plaintiffs of a similar nature are concluded adversely to the plaintiffs by the authorities and reasoning set forth above.

### JUDGMENT

For the reasons given, it is hereby

Ordered and adjudged that plaintiffs' Complaint and Claim for Refund be, and it is hereby, dismissed with prejudice at the cost of the plaintiffs.